# THE ROGERS LOCOMOTIVE MACHINE WORKS *v.* AMERICAN EMIGRANT COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

No. 23.   Argued March 24, 1896. — Decided December 7, 1896.

In a suit by the American Emigrant Company to obtain a decree quieting its title to certain lands in Calhoun County, Iowa, of which the defendants have possession, the plaintiff asserted title under the act of Congress known as the Swamp Land act of 1850, 9 Stat. 519, c. 84; the defendants under the act of Congress of May 15, 1856, 11 Stat. 9, c. 28, granting land to Iowa to aid in the construction of railroads in that State, including one from Dubuque to Sioux City. The principal contention of the plaintiff was that the lands passed to the State under the act of 1850, and were not embraced by the railroad act of 1856. By an act passed January 13, 1853, the State of Iowa granted to the counties respectively in which the same were situated the swamp and overflowed lands granted to the State by the Swamp Land act of 1850. Congress, by an act approved May 15, 1856, granted lands to Iowa to aid in the construction of certain railroads in that State, among others a railroad from Dubuque to Sioux City. That act excepted from its operation all lands previously reserved to the United States by any act of Congress, or in any other manner, for any purpose whatsoever. The lands, interests, rights, powers and privileges granted by the last-named act, so far as they related to the proposed road from Dubuque to Sioux City, were transferred by the State in 1856 to the Dubuque and Pacific Railroad Company. In the same year, the county court of Calhoun County, Iowa, appointed an agent to select and certify the swamp lands in that county, in accordance with the above act of 1853. The lands in controversy are within the limits of the railroad grant of May 15, 1856, and were earned by the building of the road from Dubuque to Sioux City, if they were subject at all to that grant. The several defendants hold by sufficient conveyance all the title and interest which passed under the railroad grant, if any title or interest thereby passed. Under date of December 25, 1858, these with other lands were certified to the State by the General Land Office of the United States as lands within the place limits defined by the railroad act of 1856 of the Dubuque and Pacific Railroad. A list of the tracts so certified to the State was approved by the Secretary of the Interior, subject to the conditions of the act of 1856 and to any valid interfering rights existing in any of the tracts embraced in the list. The selection of these lands as swamp lands by the agent of Calhoun County was reported to the county court of that county September 30, 1858. March 27, 1860, the surveyor general for the State certified these lands as swamp and overflowed lands, and this certificate was received in the General Land Office

March 27, 1860, and at the local land office at Des Moines, Iowa, February 18, 1874. It did not appear that the Secretary of the Interior ever took any action in respect to the lists made by the agent of Calhoun County of lands selected by him as swamp lands, nor that the State or the county, or any one claiming under the county, ever directly sought any action by the General Land Office or by the Secretary of the Interior in respect to such selection. December 12, 1861, a written contract was made between the county of Calhoun, Iowa, and the American Emigrant Company in relation to the swamp and overflowed lands in that county. Subsequently, in 1863, the county, although no patent had. ever been issued to the State, conveyed to that company the lands in controversy. *Held,*

(1) That the Secretary of the Interior had no authority to certify lands under the railroad act of 1856 which had been previously granted to the State by the Swamp Land act of 1850;

(2) That whether the lands in controversy were swamp and overflowed lands within the meaning of the act of 1850 was to be determined, in the first instance, by the Secretary of the Interior; and that when he identified lands as embraced by that act, and not before, the State was entitled to a patent, and on such patent the fee simple title vested in the State, and what was before an inchoate title then became perfect as of the date of the act;

(3) That when the Secretary of the Interior certified in 1858 that the lands in controversy inured to the State under the railroad act of 1856, he, in effect, decided that they were not embraced by the Swamp Land act of 1850; that it was open to the State, before accepting the lands under the railroad act, to insist that they passed under the act of 1850 as swamp and overflowed lands; that if the State considered the lands to be covered by the Swamp Land act, its duty was to surrender the certificate issued to it under the railroad act; and that it could not take them under one act, and, while holding them under that act, pass to one of its counties the right to assert an interest in them under another and different act;

(4) That the county of Calhoun, being a mere political division of the State, could have no will contrary to the will of the State; that its relation to the State is such that the action of the latter in 1858 in accepting the lands under the railroad act was binding upon it as one of the governmental agencies of the State; that the county could not, after such acceptance, claim these lands as swamp and overflowed lands, or, by assuming to dispose of them as lands of that character, pass to the purchaser the right to raise a question which it was itself estopped from raising; that the Emigrant Company could not, by any agreement made with the county in 1861 or afterwards, acquire any greater rights or better position in respect to these lands than the county itself had after the certification of them to the State in 1858 as lands inuring under the railroad

act of 1856; and that the plaintiff claiming under the county and State was concluded by the act of the State in accepting and retaining the lands under that statute.

THE present suit was brought by the American Emigrant Company for the purpose of obtaining a decree quieting its title to certain lands in Calhoun County, Iowa. The plaintiff asserts title under the act of Congress known as the Swamp Land act of September 28, 1850, c. 84, 9 Stat. 519; the defendants, under the act of Congress of May 15, 1856, 11 Stat. 9, c. 28, granting land to Iowa in aid of the construction of various railroads in that State, among others a railroad from Dubuque to Sioux City with a branch from the mouth of Tête des Morts to the nearest point on that road.

The principal contention of the plaintiff is that the lands passed to the State under the act of 1850, and were not embraced by the railroad act of 1856.

A decree was passed adjudging the plaintiff to be the owner of some of the tracts described in its petition. As to other tracts the suit was dismissed. Upon appeal by the defendants to the Supreme Court of Iowa the decree was affirmed. 83 Iowa, 612. The present writ of error brings that decree before us for examination.

By the above act of September 28, 1850, all swamp and overflowed lands made unfit thereby for cultivation were granted to the respective States in which they were situated that they might be reclaimed by the construction of the necessary levees and drains. By the second section of that act it was made the duty of the Secretary of the Interior, as soon as practicable after the passage of the act, to make out an accurate list and plats of such lands, and transmit the same to the Governor of the State, and at the request of the latter, " cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State "— the proceeds of the lands, whether from sale or by direct appropriation in kind, to be applied, exclusively, as far as necessary, to the purpose of reclaiming the lands by means of the levees and drains. By the third section it was provided that " in making out a list and plats of the land aforesaid, all

legal subdivisions, the greater part of which is ' wet and unfit for cultivation,' shall be included in said list and plats ; but when the greater part of a subdivision is not of that character, the whole of it should be excluded therefrom." 9 Stat. 519.

The legislature of Iowa, by an act passed February 5, 1851, authorized the commissioner of the state land office to take steps necessary to secure to the State the lands granted by the above act. To that end, the commissioner, having reason to believe there were any tracts of swamp land within the State not reported as such by the United States surveyor, sufficient to justify a more particular examination, was to direct the county surveyor of any county in which the lands were located " to make the examination and provide the proofs necessary to secure such lands to the State, a list of which shall be returned to the land commissioner or the authority acting in that capacity, verified by affidavit," etc. Laws of Iowa, 1850, 1851, p. 169, c. 69.

By a subsequent statute of Iowa, passed January 13, 1853, the swamp and overflowed lands granted to the State by the act of 1850 were granted " to the counties respectively in which the same may lie, or be situated, for the purpose of constructing the necessary levees and drains, to reclaim the same — and the balance of said lands, if any there be after the same are reclaimed as aforesaid, shall be applied to the building of roads and bridges, when necessary, through or across said lands, and if not needed for this purpose, to be expended in building roads and bridges within the county." The same act provided that " whenever it shall appear that any of the lands granted to the State by the aforesaid act of Congress, shall have been sold by the United States since the passage of that act, it shall be lawful for the said counties to convey said lands to the purchasers thereof." It also provided that in all the counties where the county surveyor had made no examination and report of the swamp lands within his county, in compliance with the instructions from the governor, the county court should appoint some competent person, who should proceed " to examine said lands, and make due report, and plats, upon which the topography of the

country shall be carefully noted, and the places where drains or 'levees ought to be made, marked on the said plats, to the county courts' respectively, which courts shall transmit to the proper officers, lists of all said swamp lands in each of the counties in order to procure the proper recognition of the same, on the part of the United States, which lists, after. an acknowledgment of the same by the General Government, shall be recorded· in a well-bound book provided for that purpose, and filed among the records of the county court." Laws of Iowa, 1852, p. 29, c. 12.

By an act passed January 25, 1855, the governor of Iowa was authorized and empowered to draw from the Treasury of the United States all moneys arising from the disposition of the swamp lands of Iowa by the government of the United States. The same act provided: "3. That the Governor is hereby authorized to adopt such measures as to him may.seem expedient, to provide for the selection of the swamp lands of this State, and to secure to. the State the title to the same, and also for the selection in the name of the State, [of] other lands, in lieu of such swamp lands as may have been or may hereafter be entered with warrants: *Provided,* That the provisions of this act shall not be construed to apply to any swamp lands which have already been selected by any organized county of this State under the provisions of any previous law: *And provided further,* That this act shall not be construed to impair the rights of the counties of this State to any swamp lands within said counties under the provisions of any law in force in relation to the same, and that the selections made by the organized counties shall be reported by the Governor to the authorities at Washington." Laws of Iowa, 1854–1856, p. 261, c. 138; Iowa Revision, 1860, p. 154, c. 47, art. 4.

By another act also passed January 25, 1855, amendatory of the act of January 13, 1853, it was provided: "§ 1. That no swamp or overflowed lands granted to the State, and situate in the. present unorganized counties, shall be sold or disposed of till the title to said lands shall be perfected in the State, whereupon the titles to said lands shall be transferred to the said counties where they are situated: *Provided,* That

said counties shall refund to the State the expenses incurred in selecting said lands, under the provisions of an act of the General Assembly, authorizing the Governor to cause said lands to be surveyed and selected, with ten per cent interest thereon. Each county to refund its proportional amount of said expenses." Laws of Iowa, 1854–1856, p. 173, c. 110; Iowa Revision, 1860, p. 154, c. 47, art. 5.

It appears that in 1856 the county court of Calhoun County appointed Charles Amy to select and survey the swamp lands in that county, in accordance with the provisions of the above act of January 13, 1853.

This was after the passage by Congress of the railroad act of May 15, 1856, granting lands to the State of Iowa to aid in the construction of certain railroads in that State. 11 Stat. p. 9, c. 28. By that act there was granted to Iowa, to aid in the construction of railroads, among them a railroad from Dubuque to Sioux City, with a branch, every alternate section of land, designated by odd numbers, for six sections in width on each side of the respective roads named by Congress. If it appeared at the time the route of a road was definitely fixed that the United States had sold any of the sections or parts of sections granted, or that the right of preëmption had attached to the same, then the State, "subject to the approval of the Secretary of the Interior," was entitled to select other lands nearest to the sections granted to supply the deficiency. But, it was declared, "That any and all lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States."

The above act of May 15, 1856, with its provisions and restrictions, was accepted by the State by an act approved July 14, 1856, and the lands, interests, rights, powers and privileges

granted by Congress, so far as they related to the proposed road from Dubuque to Sioux City, were granted and transferred to the Dubuque and Pacific Railroad Company, to aid in the construction of its railroad and branch, subject to the conditions and incumbrances prescribed by Congress. These lands were transferred to the railroad company upon the express condition that, if it did not complete and equip a given number of miles of its road within a named time, and its entire line, on or before such certain date, then the State might resume all rights to the lands so granted and remaining undisposed of by the company. Iowa Revision, 1860, p. 215, c. 55, art. 2.

By a supplementary act, passed January 28, 1857, the companies obtaining the benefits of the act of Congress of 1856, and of the act of the Iowa legislature of July 14, 1856, were authorized to make such disposition, by mortgage or deed of trust, of the lands granted by the act of 1855, as might be deemed proper to secure construction bonds necessary for the completion of their roads ; such mortgage or deed of trust to be a binding and valid lien upon all the property mentioned therein, including rolling stock, and the purchasers, under a trustee's sale or foreclosure of mortgage, to have and enjoy all the rights of a purchaser on execution sale. Iowa Revision, 1860, p. 222, c. 55, art. 5.

It was stipulated by the parties that the lands in controversy "are within the limits of the railroad grant of May 15, 1856, to aid in building a railroad from Dubuque to Sioux City, and were earned by the building of said road if they were subject to said grant; and that the various defendants hold by apt and sufficient conveyance all the title and interest in said lands which passed under and by said grant, if any title or interest did pass thereunder or thereby." This, of course, implies that the railroad company performed all the conditions prescribed, in reference to these lands, either by the act of Congress of May 15, 1856, or by the acts of the Iowa legislature.

It appears in evidence that the lands in controversy and other lands were certified to the State by the General Land Office of the United States, under date of December 25, 1858,

as lands within the six-mile or place limits defined by the act of Congress of May 15, 1856, "being the vacant and unappropriated lands in the alternate sections designated by odd numbers, for six sections in width on each side of the Dubuque and Pacific Railroad and branch within the State of Iowa." The lists of those tracts were first submitted by the Commissioner of the General Land Office "for the approval of the Secretary of the Interior, in accordance with the requirements of the said act of May 15, 1856, subject to all its conditions and to any valid interfering rights which may exist to any of the tracts embraced in the foregoing list." The certificate of December 25, 1858, was endorsed by the Secretary of the Interior, "Approved, subject to the conditions and rights above mentioned."

It was further stipulated, in this case, that "all of the lands in controversy were selected by duly authorized and appointed agents of Calhoun County as swamp lands under the act of Congress, September 28, 1850, and reported the same to the county court of Calhoun County September 30, 1858."

On the 27th of March, 1860, the surveyor general for the State of Iowa certified that the lists of lands that had been selected by the county surveyors or state locating agents as swamp lands had been carefully compared with field notes, plats and other evidence on file in his office, and, "by the affidavits of said county surveyors or state locating agents, it appears that the greater part of each smallest legal subdivision of the lands embraced in said list is swampy or subject to such overflow as to render the same unfit for cultivation, and is therefore of the character contemplated by the act of 28th of September, 1850." The list was endorsed in the General Land Office, "Received with the surveyor general's letter of March 27, 1860."

The list of the lands selected in the manner above stated by the agent of Calhoun County, together with a letter from the Commissioner of the General Land Office, dated February 12, 1874 (this date is erroneously stated in the record to be 1884), was received at the local land office at Des Moines, Iowa, on the 18th day of February, 1874.

ROGERS LOCOMOTIVE WORKS v. EMIGRANT CO. 567

It does not appear that the Secretary of the Interior ever took any action in respect to the lists made by the agent of Calhoun County of lands selected by him as swamp lands, nor that the State or the county, nor any one claiming under the county, ever directly sought any action by the General Land Office or by the Secretary of the Interior in respect of such selections.

It should be here stated that on the 12th day of December, 1861, a written contract was made between the county of Calhoun, Iowa, and the American Emigrant Company, in relation to the swamp and overflowed lands in that county. Subsequently, in 1863, the county conveyed to the company, subject to the provisions of the Swamp Land act of 1850, the lands in controversy and other lands, upon certain conditions, which it is unnecessary to set forth.

*Mr. Charles A. Clark* for plaintiffs in error.

*Mr. J. J. Davis* for defendant in error.

The selection of the lands by the duly authorized agents of the State, and the approval thereof by the surveyor general of the United States, and the report of the same to the General Land Office, and the reception and recognition thereof by said office, constitute an identification and segregation of the lands as swamp lands, pursuant to the laws of the State, and the instructions of the Secretary of the Interior, and are evidence of the swamp character of the land, and that the title thereto vested in the State of Iowa under the swamp land grant. *Martin* v. *Marks*, 97 U. S. 345.

It is held by the United States land office, in a case of contest of swamp lands, that the selection of land by the State under the swamp land grant, establishes a *prima facie* case that the land so selected is swamp land within the meaning of the act of September 28, 1850.

That act *ex proprio vigore*, was a grant *in præsenti* to the States of all the swamp and overflowed lands therein situated. The title to the lands vested in the State at once on the pas-

sage of the act. The title was not inchoate and was not merely equitable, but was absolute and complete. The requirement of the second section of the act that a patent be thereafter issued is not to be deemed as withholding the vesting of the title under the language of the first section of the grant. The patent when issued is merely evidential of what was granted, the title to which had theretofore vested.

The holder of the swamp land title, even before patent has been issued, can maintain an action at law to recover swamp lands against a subsequent patent held by a preëmptioner under the preëmption laws of the United States. *Wright* v. *Roseberry*, 121 U. S. 488; *Irwin* v. *San Francisco Savings Union*, 136 U. S. 578; *Railroad Co.* v. *Smith*, 9 Wall. 95.

Not only was the swamp grant a grant *in præsenti*, vesting the title of the land in the State immediately upon the passage thereof, but by its terms and the nature of the case it furnished a means of identifying the subject-matter of the grant, and any one who, subsequently to the date of the grant, attempts to enter upon such land, or to claim any rights thereto, does so with notice and knowledge of the fact that the land is of the character embraced within the terms of the grant, and that he can obtain no right, title or interest thereto. This is the settled rule of this court. *Wright* v. *Roseberry, ubi supra.*

It is the province of the Secretary of the Interior, or of the Land Department acting for him, in the first instance, to determine the character of land claimed to be swamp, but if he fails, refuses or neglects to do his duty, or if he deprives himself of jurisdiction in the premises, then the question is for the courts to determine. It will not be disputed that parol evidence is admissible before the Secretary of the Interior, and when the courts are vested with jurisdiction to determine the question, the same evidence that is admissible before the Secretary of the Interior is necessarily admissible before the court.

In this case the Secretary of the Interior has neglected and failed to pass upon the question of the character of the lands in controversy; and by certifying them to the railroad company subsequently to the swamp grant, and prior to the pres-

entation to him of the swamp selection, has deprived himself of jurisdiction to act in the premises, thereby bringing the case within the exact rule of the case of *Railroad Co.* v. *Smith,* 9 Wall. 95.  See also *McCormick* v. *Hayes,* 159 U. S. 332; and *Railroad Co.* v. *Fremont County,* 9 Wall. 89.

When the Land Department of the United States certified the lands in suit under the railroad grant, it deprived itself of jurisdiction to investigate and determine the character of the lands, or to patent the same under the swamp grant.  In this connection, it will be remembered, that the certifications under the railroad grant were made before the swamp land selections had reached the Department.  The Executive Department had no power to recall the certifications after they were issued, however wrongful they may have been; nor could it cancel these certifications; nor had it any right or authority to issue patents under the swamp grant after the certifications had been issued.  This is the well-established rule of the department in such cases, and it is based upon the decisions of this court.  *Buena Vista County* v. *Iowa Falls &c. Railroad,* 112 U. S. 165; *Wright* v. *Roseberry, ubi supra; Bicknell* v. *Comstock,* 113 U. S. 149; *Mullan* v. *United States,* 118 U. S. 271.

The lands in suit have been certified as railroad lands, but they should have been patented as swamp lands.  The railroad claimant is a trustee of the rightful owner, who is entitled to any appropriate relief that a court of equity has power to grant.  The swamp title may be established and quieted, and the railroad claimant enjoined from asserting any adverse claim, as has been done in this case; or the railroad claimant may be compelled to convey to the rightful owners.  *Stark* v. *Starrs,* 6 Wall. 402, 413; *Silver* v. *Ladd,* 7 Wall. 219; *Lytle* v. *Arkansas,* 9 How. 314; *Warren* v. *Van Brunt,* 19 Wall. 646.

The lands in controversy herein having been thus found to be swamp and overflowed lands within the meaning of the act of September 28, 1850, by the referee, by the trial court, and by the Supreme Court of the State, these findings will not be disturbed by this court in this proceeding in error.  *Dower* v. *Richards,* 151 U. S. 658.

Mr. Justice Harlan, after stating the case as above reported, delivered the opinion of the court.

In the light of the facts as stated above, and of the Federal and state legislation relating to the matters in controversy, we proceed to the consideration of the questions presented for our determination.

As the railroad act of 1856 excepted from its operation all lands theretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for any purpose whatever, the certification to the State by the Department of the Interior of the lands in controversy as having inured, under the railroad act of May 15, 1856, to the State for the benefit of the Dubuque and Pacific Railroad Company, was unauthorized, if at the date of the Swamp Land act of 1850 the lands were swamp and overflowed lands, whereby they were unfit for cultivation; for, lands of that character were expressly reserved from the operation of the railroad grant of 1856. If they were not granted to the State for the benefit of the railroad company, because previously granted to the State as swamp and overflowed lands, they could not properly have been certified or transferred to the State to be applied in aid of the construction of the railroad. *McCormick* v. *Hayes*, 159 U. S. 332, 338.

But it is equally true that the act of 1850 made it the duty of the Secretary of the Interior, as soon as practicable after the passage of that act, to make out an accurate list and plats of the swamp and overflowed lands granted to any State and transmit them to the executive of such State, "and, at the request of said governor, cause a patent to be issued to the State therefor; and *on that patent* the fee simple to said lands shall vest in said State," subject to the disposal of its legislature. While, therefore, as held in many cases, the act of 1850 was *in præsenti*, and gave an inchoate title, the lands needed to be identified as lands that passed under the act; which being done, and not before, the title became perfect as of the date of the granting act. *Wright* v. *Roseberry*, 121 U. S. 488, 494 *et seq.*; *Tubbs* v. *Wilhoit*, 138 U. S. 134, 137; *Chandler* v. *Calu-*

*met. & Hecla Mining Co.*, 149 U. S. 79, 91. So, in *Ehrhardt* v. *Hogaboom*, 115 U. S. 67, 68 : " In *French* v. *Fyan*, 93 U. S. 169, this court decided that, by the second section of the Swamp Land act, the power and duty devolved upon the Secretary of the Interior, as the head of the Department which administered the affairs of the public lands, of determining what lands were of the description granted by that act, and made his office the tribunal whose decision on that subject was to be controlling." The identification of lands as lands embraced by the Swamp Land act was therefore necessary before the State could claim a patent or exercise absolute control of them.

In *McCormick* v. *Hayes*, above cited, it appeared that the Secretary of the Interior, proceeding under the railroad act of May 15, 1856, had certified certain lands as inuring to Iowa under that act. It was insisted in that case that the lands were covered by the act of 1850, and, therefore, that they were improperly certified under the railroad act of 1856 ; a fact which, it was contended, could be established by parol evidence, so as to fix the title in certain parties, independently of any action that may have been taken by the Interior Department upon the subject. The precise nature of that case is shown by this extract from the opinion of the court : " The controlling question, therefore, in this case, so far as the plaintiff is concerned — and he must recover upon the strength of his own title, even if that of the defendant be defective — is whether, under the circumstances disclosed by the record, the particular lands in controversy, in the absence of any selection and certification of them by the United States to the State, under the Swamp Land act, can be shown by parol testimony to have been, in fact, at the date of that act, swamp and overflowed lands. Congress having made it the duty of the Secretary of the Interior to make out accurate lists and plats of the lands embraced by the Swamp Land act, and transmit the same to the governor of the State, and, at the request of the latter, to cause a patent to be issued to the State therefor, and having provided that ' on that patent the fee simple to said lands shall vest in said State subject to

the disposal of the legislature thereof,' did the title vest in the State, by virtue alone, and immediately upon the passage, of the act, without any selection by or under the direction of the Department of the Interior, so that the State's grantees could maintain an action to recover the possession of them?"

In determining that question this court, after an extended review of former decisions, thus stated (pp. 346–347) its conclusions: "The case before us is not like that of *Railroad Co.* v. *Smith*, in which, as subsequently explained in *French* v. *Fyan*, it was shown that there was an absolute neglect of duty on the part of the Interior Department, in that it neither made nor would make any selection of lists whatever, and, therefore, there was no action by that Department that could be relied on as a determination of the question whether the particular lands then in dispute were or were not embraced by the Swamp Land act. That case was exceptional in its circumstances, and seemed to justify the decision rendered, in order to prevent a total failure of justice, arising from the unexplained neglect of the Land Department to perform the duty imposed by the act of 1850. What was said in *French* v. *Fyan* shows that this court not only so regarded the previous case, but it was in effect said that the ruling in *Railroad Company* v. *Smith* was not to be extended to any case in which the Land Department had taken action, or made a decision or determination under the Swamp Land act." Again, and in reference to the certification of lands under the railroad act of 1856: "Twice the Land Department certified these lands to the State as inuring to it under the railroad land grant act, and it does not appear that the State has ever questioned the correctness of that certification or applied to the Secretary of the Interior for a reëxamination as to the character of the lands. . . . Upon the authority of former adjudications, as well as upon principle, it must be held that parol evidence is inadmissible to show, in opposition to the concurrent action of Federal and state officers, having authority in the premises, that these lands were, in fact, at the date of the act of 1850, swamp and overflowed grounds, which should have been embraced by Linn County in its selection of land of that char-

acter, and withheld from the State as lands granted expressly in aid of railroad construction within its limits."

One of the prior adjudications referred to in *McCormick* v. *Hayes* was *Chandler* v. *Calumet & Hecla Mining Co.*, 149 U. S. 79, 88, 89, 92. In that case, the plaintiff claimed title under the Swamp Land act of 1850; the defendant under an act of Congress of 1852 granting public lands to Michigan in aid of the construction of a ship canal around the Falls of St. Mary. The lands there in controversy were not included in swamp land selections under the act of 1850, but were included in selections under the canal grant of 1852. Referring to *Wright* v. *Roseberry*, 121 U. S. 488, in connection with previous cases, this court, speaking by Mr. Justice Jackson, said: "Under the principle announced in that case, and under the foregoing facts in the present case, it would seem that there had been such affirmative action on the part of the Secretary of the Interior in identifying the lands in this particular township, containing the lands in controversy, as would amount to an identification of the lands therein, which pass to the State by the swamp land grant, and that the selection by the State of the demanded premises under the canal grant of 1852, with the approval of the Secretary of the Interior, and the certification of the Department to the State that they were covered by the latter grant, may well be considered such an adjudication of the question as should exclude the introduction of parol evidence to contradict it. The exclusion of the land in dispute from the swamp lands, selected and patented to the State, and its inclusion in the selection of the State as land coming within the grant of 1852, with the approval of such selection by the Interior Department and the certification thereof to the State, operated to pass the title thereto as completely as could have been done by formal patent, *Frasher* v. *O'Connor*, 115 U. S. 102; and being followed by the State's conveyance to the canal company, presented such official action and such documentary evidence of title as should not be open to question by parol testimony at law. Under the facts of this case we are of opinion that the plaintiff in error could not properly establish by oral evidence that the land in

dispute was in fact swamp land, for the purpose of contradicting and invalidating the Department's certification thereof to the State and the latter's patent to the canal company."

These decisions give much greater weight to the action of the Land Department in certifying the lands in dispute under the railroad grant of 1856, than was done by the judgment below.

The Emigrant Company lays much stress upon that clause of the railroad act of 1856 exempting from its operation all lands previously reserved by the United States for any purpose. And upon this foundation it rests the contention that no lands embraced by the Swamp Land act of 1850 could, under any circumstances, be withdrawn by the Land Department from its operation, and certified to the State under the railroad act of 1856. This contention assumes that the lands in controversy were, within the meaning of the act of 1850, swamp and overflowed lands. But that fact was to be determined, in the first instance, by the Secretary of the Interior. It belonged to him, primarily, to identify all lands that were to go to the State under the act of 1850. When he made such identification, then, and not before, the State was entitled to a patent, and "on such patent" the fee-simple title vested in the State. The State's title was at the outset an inchoate one, and did not become perfect, as of the date of the act, until a patent was issued.

But it is equally clear that when the Secretary of the Interior certified in 1858 that the lands in controversy inured to the State under the railroad act of 1856, he, in effect, decided that they were not embraced by the Swamp Land act of 1850. This, perhaps, furnishes an explanation not only of the fact that no action was taken upon the report filed in the General Land Office in 1860 showing that the agent of Calhoun County had selected these lands as swamp and overflowed lands, but of the further fact that, so far as this record discloses, the attention of the Secretary of the Interior was never directly called by the county to any claim by it, under the act of 1850, to the lands certified under the railroad act of 1856. Nor does it appear that the American Emigrant Company,

whose original contract with the county was made in 1861, ever questioned before the Land Department the validity of the Secretary's certification in 1858 of these lands as passing to the State under the act of 1856, or asserted a claim to them, until it brought this suit in 1877, nearly twenty years after that officer certified them to the State under the railroad act.   And it is significant that this action of the Interior Department does not seem ever to have been called in question by the State.

The case then is this: In 1858, the Secretary of the Interior decided that the lands in controversy inured to the State under the railroad act of 1856, and, if that decision was correct, then they were not reserved from the operation of that act by the Swamp Land act of 1850.   The State was entitled to the lands either under the act of 1850 or under that of 1856.   It was open to it, before accepting the lands under the railroad act, to insist that they passed, under the act of 1850, as swamp and overflowed lands.   No such claim was made.   The State — the party primarily interested, and with whom the Land Department directly dealt — accepted the lands under the act of 1856, and, therefore, not as inuring to it as swamp and overflowed lands within the meaning of the act of 1850, and, as just stated, has never repudiated its action of 1858, nor sought to have reopened the question necessarily involved in the action of the Secretary when he certified the lands to the State under the act of 1856.

It would seem that, upon every principle of justice, the action of the Secretary of the Interior in certifying these lands to the State under the act of 1856 should not be disturbed. The fact that his certification was made subject " to any valid interfering rights which may exist to any of the tracts " embraced in his certificate does not affect this conclusion.   That reservation could not have referred to any rights which the State acquired or could have asserted under some other act of Congress than that of 1856.   Certainly, it was not intended by the Interior Department to certify the lands under the railroad act of 1856 subject to the right of the State, while holding them under that certificate, to claim them under some other and prior act.   The action of the Department in 1858

was intended to be final, as between the United States and the State, in respect of the lands then certified as railroad lands. If the State considered the lands to be covered by the Swamp Land act, its duty was to surrender the certificate issued to it under the railroad act. It could not take them under one act, and while holding them under that act pass to one of its counties the right to assert an interest in them under another and different act.

Are those in this action who claim under the State and under the act of 1850 in any better condition than the State? Can they be heard to question the action of the Land Department in 1858, if the State is estopped from so doing? We have seen that the county of Calhoun made a written agreement in 1861 with the American Emigrant Company relating to swamp and overflowed lands. But if no such agreement had been made, would the county be heard to say that the Land Department erred, as matter of fact, when, in 1858, it decided that these lands passed to the State under the railroad act? Would the creature of the State be permitted to say what its creator was estopped from saying? The county of Calhoun is a mere political subdivision of the State, created for the State's convenience, and to aid in carrying out, within a limited territory, the policy of the State. Its local government can have no will contrary to the will of the State, and it is subject to the paramount authority of the State, in respect as well of its acts as of its property and revenue held for public purposes. The State made it, and could, in its discretion, unmake it, and administer such property and revenue through other instrumentalities. *Jefferson County* v. *Ford*, 4 Greene, (Iowa) 367, 370; *Soper* v. *Henry County*, 26 Iowa, 264, 267; *Maryland* v. *Baltimore & Ohio Railroad*, 3 How. 534, 550; *United States* v. *Railroad*, 17 Wall. 322, 329; *Hamilton County Commissioners* v. *Mighels*, 7 Ohio St. 109, 118; *Askew* v. *Hale County*, 54 Alabama, 639, 640; 1 Dillon's Mun. Corp. §§ 22–23, 54–71 inclusive and authorities there cited; Angel & Ames on Corp. § 31.

It would seem to be clear that the relations of the county and the State are such that the action of the latter in accept-

ing the lands in controversy under the railroad act was binding upon the county of Calhoun, as one of the governmental agencies of the State; and that the county could not, after such acceptance, claim these lands as swamp and overflowed lands, or, by assuming to dispose of them as lands of that character, pass to the purchaser the right to raise a question which, in view of its subordination to the State, it was estopped from raising. We are of opinion that the plaintiff could not, by any agreement made with the county in 1861 or afterwards, acquire any greater rights, or better position, in respect of these lands, than the county itself had after the certification of them in 1858 as lands inuring to the State under the railroad act of 1856.

When the equities of the respective parties are considered, the view we have expressed is much strengthened by the circumstance that the defendants and those under whom they claim, or some of them, have paid taxes upon these lands ever since 1862, that is, for fifteen years before the institution of this suit in 1877.

We are of opinion that the Supreme Court of Iowa did not give proper effect to the action of the Interior Department in 1858. It should have been adjudged that, so far as the lands in controversy are concerned, the plaintiffs claiming under the county of Calhoun and the State, as well as under the act of 1850, were concluded by the act of the Secretary of the Interior when he certified such lands as inuring to the State under the railroad act of 1856, and by the act of the State in accepting and retaining the lands under that act; consequently, the suit should have been dismissed for want of equity, with costs to the respective defendants.

*The judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.*