UNITED STATES v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court of Appeals, Eighth Circuit.   March 3, 1908.)

No. 2,545

1. PUBLIC LANDS—SWAMP LAND GRANT—SELECTION OF LANDS.
    The swamp land grant to the states of September 28, 1850 (9 Stat. 519, c. 84), did not attach to any particular lands until they had been identified as swamp lands by the Secretary of the Interior or other competent authority of the United States.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 186.]

2. SAME—RESERVATION OF LAND FROM GRANT—UNRECOGNIZED CLAIM BY THIRD PARTY.
    The mere assertion of a claim to public land, not recognized by the Land Department of the United States in any manner, does not operate to reserve or segregate such land from the public domain so as to prevent it from passing under a grant by Congress.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 44.]

3. SAME—RAILROAD GRANT—EXCEPTION OF LANDS RESERVED.
    The action of the state of Iowa, and its counties acting under state authority, in causing lists of lands claimed by the state under the swamp land grant of September 28, 1850 (9 Stat. 519, c. 84), to be made and filed with the Land Department subsequent to Act March 3, 1857, c. 117, 11 Stat. 251, which approved prior selections, did not prevent the passing of lands shown on such lists under the grant of May 12, 1864 (13 Stat. 72, c. 84), for the benefit of the McGregor Western Railroad Company, which excepted lands reserved by the United States "for any purpose whatever," where, at the time of such grant and the filing of the map of definite location of the road by which the place limits of the grant were determined, no action had been taken by the Land Department with respect to such lists, but they were subsequently acted upon and rejected, and the land was patented under the railroad grant.

Appeal from the Circuit Court of the United States for the Northern District of Iowa.

For opinion below, see 148 Fed. 884.

F. F. Faville (J. A. Rogers, on the brief), for appellant.

Charles E. Vroman (W. J. Knight, on the brief), for appellee.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge.   This was an action in equity, brought by the United States pursuant to the provisions of Act March 3, 1887, c. 376, 24 Stat. 556 (U. S. Comp. St. 1901, p. 1595), and Act March 2, 1896, c. 39, 29 Stat. 42 (U. S. Comp. St. 1901, p. 1603), and section 2357 of the Revised Statutes (U. S. Comp. St. 1901, p. 1444), against the defendant railway company for an accounting, and to recover the value of certain lands situated in Kossuth, Palo Alto,

and Dickinson counties, in the state of Iowa, alleged to have been erroneously patented to and afterwards sold by the railway company. The lands are conceded to have been within the grant to the state of Iowa for the benefit of the McGregor Western Railroad Company and its lawfully constituted successor, the defendant railway company, by Act May 12, 1864, c. 84, 13 Stat. 72, and to have been lawfully and properly patented to the state, and by it to the railway company, unless the same had been, prior thereto, reserved by the United States for some other purpose within the meaning of the act of 1864. That act, after granting every alternate odd section of land for 10 sections in width on each side of the road as it should be located, provides that in case it shall appear, when the lines or routes of said roads are definitely located, that the United States have "sold any section or any part thereof granted as aforesaid or that the right of pre-emption or homestead settlement has attached to the same or that the same has been reserved by the United States for any purpose whatever," then selections might be made, within certain fixed indemnity limits, to make up for such lost lands. To emphasize this general language the act contains the following specific provision:

"Provided further, that any and all lands heretofore reserved to the United States by any act of Congress or in any other manner by competent authority for the purpose of aiding in any object of internal improvement or other purpose whatever, be and the same are hereby reserved and excepted from the operation of this act."

The map of definite location of defendant's railroad was filed August 30, 1864. There is no claim that the lands in controversy had been sold by the United States, or that the rights of any pre-emptor or homestead settler had attached to them before the grant of 1864, but it is claimed by the United States that the lands had been so reserved by proceedings taken under Act Sept. 28, 1850, c. 84, 9 Stat. 519, known as the "Swamp Land Act," as to segregate them from the public domain, and withdraw them from sale; and, accordingly, that in view of such proceedings title to these lands never passed to the state for the benefit of the railroad company by that grant.

Did the act of September 28, 1850, and proceedings taken under it in Iowa amount to a reservation of the lands in controversy from sale? The swamp land act of 1850 was enacted primarily for the benefit of the state of Arkansas, but section 4 extended its provisions to and for the benefit of any other state in which swamp and overflowed lands were situated, and this extension, it is conceded, covered the state of Iowa. The act granted to the different states all swamp and overflowed lands unfit for cultivation, to enable them to construct levees and drains and to reclaim them. Section 2 of the act imposed the duty upon the Secretary of the Interior, as soon as practicable after the passage of the act, to make out an accurate list and plat of such swamp and overflowed lands, and transmit the same to the Governor of the state in which they were located, and at the request of the Governor to cause a patent to be issued to the state therefor; and it was provided that, upon the issue of such patent, the fee-simple title thereto should vest in the state.

This act has been the subject of much litigation, and its meaning

has now become firmly fixed by the decisions of the Supreme Court of the United States. It was a present grant, proprio vigore, of all lands which were in fact swamp and overflowed lands and unfit for cultivation. But the lands had first to be identified as such before title to any particular lands passed out of the United States. After that identification was made, and not before, the title vested; but it then vested by relation as of the date of the granting act. Rogers Locomotive Works v. Emigrant Co., 164 U. S. 559, 570, 17 Sup. Ct. 188, 41 L. Ed. 552; Michigan Land & Lumber Co. v. Rust, 168 U. S. 589, 591, 18 Sup. Ct. 208, 42 L. Ed. 591; Brown v. Hitchcock, 173 U. S. 473, 476, 19 Sup. Ct. 485, 43 L. Ed. 772. The prerequisite identification was intrusted to the Secretary of the Interior as the head of the department in control of the public lands, and until that tribunal acted, the lands remained subject to its jurisdiction, and the grant did not take effect upon any particular lands so as to vest title in the state. French v. Fyan, 93 U. S. 169, 171, 23 L. Ed. 812; Rogers Locomotive Works v. Emigrant Co., supra; Michigan Land & Lumber Co. v. Rust, supra.

The second section of the act of 1850 created a tribunal to hear and determine what lands fell within the terms of the grant. Whether any given lands were swamp and overflowed lands and thereby unfit for cultivation was left to the arbitrament of the Secretary of the Interior as the head of the Land Department. Mr. Justice Miller speaking for the Supreme Court in French v. Fyan, supra, said:

"We are of opinion that this section [2] devolved upon the Secretary, as the head of the department which administered the affairs of the public lands, the duty, and conferred on him the power, of determining what lands were of the description granted by that act, and made his office the tribunal whose decision on that subject was to be controlling."

It is conceded, for the purposes of this case, that on October 31, 1876, the Commissioner of the General Land Office, who by law acted for and under the direction of the Secretary of the Interior, after due notice and as a result of a public hearing held and adjudged that the lands in controversy in Kossuth, Palo Alto, and Dickinson counties were not in fact swamp and overflowed lands, and were not embraced in the act of 1850, that the state of Iowa and the counties mentioned were never entitled to the lands or any portion of them, and that patents subsequently issued therefor to the state for the benefit of the railway company. The decision of the Land Commissioner so made was never appealed from, reversed, or modified, and there is now no pretense either that there was any mistake of law or misapprehension of the facts brought about by fraud or gross mistake. That decision and the issue of the patents accordingly constitute a binding adjudication upon the parties to this suit that the lands in question were never granted to the state by the swamp land act of 1850. Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. 985, 30 L. Ed. 1039; Barden v. Northern Pac. Railroad, 154 U. S. 288, 327, 14 Sup. Ct. 1030, 38 L. Ed. 992, and cases cited.

This is not seriously questioned, but the contention of the United States is that the steps taken, in the way of asserting title to the lands by the state, so segregated them from the public domain, while the

inquiry as to their character was being made, that they were not subject to sale in 1864, and for that reason did not pass by the grant in question of that year.   What were those steps?   No directions were given to the Secretary of the Interior concerning his method of procedure in the identification of lands within the contemplation of the act of 1850.   That seems to have been left to his own discretion.   Accordingly, a consideration of the acts done and left undone by him in the exercise of that discretion, as well as the acts and doings of the state in the assertion of its claim, require consideration.

The Commissioner of the General Land Office soon after the act was passed, on November 21, 1850, instructed the United States surveyor general for the state of Iowa to make out lists of all lands claimed to be granted to the state by that act, and in his letter of instruction said:

"The only data in your possession from which these lists can be made are the field notes of the surveyor on file in your office, and if the authorities of the state are willing to adopt these as the basis of these lists, you will so regard them.   If not, and these authorities furnish you satisfactory evidence that any lands are of the character embraced in the grant, you will report them."

It does not appear that the state authorities were willing to or did adopt the showing made by the field notes to determine their right to the lands.   On the contrary, it does appear that the state undertook to demonstrate its right by other satisfactory evidence.

The Legislature of Iowa, by section 1, of the act of January 13, 1853 (Laws Iowa 1852–53, p. 29, c. 13;   Revision 1860, p. 148, § 925), granted to its several counties the swamp lands situated within their respective boundaries, and by section 3 of the same act provided that:

"In all those counties where the county surveyor has made no examinations and reports of the swamp lands within his county, in compliance with the instructions from the Governor, the county court shall at the next regular term thereof, after the taking effect of this act, appoint some competent person, who shall as soon as may be thereafter, after having been duly sworn for that purpose, proceed to examine said lands, and make due report, and plats, upon which the topography of the country shall be carefully noted, and the places where drains or levees ought to be made, marked on the said plats, to the county courts respectively, which courts shall transmit to the proper officers, lists of all said swamp lands in each of the counties in order to procure the proper recognition of the same, on the part of the United States, which lists, after an acknowledgment of the same by the general government shall be recorded in a well-bound book provided for that purpose, and filed among the records of the county court."

Apparently acting under this legislative authority, the county court of Kossuth county appointed two men to select and make a list for that county of what they claimed to be swamp and overflowed lands within the meaning of the act of 1850.   They filed their list, duly verified, in the office of the surveyor general for Iowa, and on August 2, 1859, that functionary transmitted a true and correct copy thereof to the General Land Office, where it was duly received and filed.   The county court of Palo Alto county appointed one man to act for that county. He made a like list for his county, and filed it in the office of the surveyor general for Iowa, who later, on March 27, 1860, transmitted a

true and correct copy thereof to the General Land Office, where in due time it was received and filed. The county court of Dickinson county appointed one man to act for that county. He made a like list and verified it on July 13, 1860, but for some reason, unexplained in the record, it did not find its way to the General Land Office until 1872.

On June 23, 1860, the Commissioner of the General Land Office wrote the surveyor general of Iowa the following letter:

"Referring to your letter of the 15th inst., asking to be advised as to your duty in reporting swamp selections in Iowa, and in view of the act of the 12th of March last, a copy of which was furnished you in my letter of the 21st ult., I will here set forth the principles, which you are to apply to any selections now on your files and to all others, also, which may hereafter be reported to you by the agents of the state: First. As the grant contemplates the inundation of extensive regions of country by such natural arteries as the Mississippi river, the lands evidently intended to be granted as swamp are those only which, by reason of their swampy character, and liability to overflow, are worthless in their natural condition, and whereon crops cannot be raised without reclamation by levees and drains. An overflow or inundation from casual cause, merely temporary in its effects, does not bring the land within the grant, and cannot be said, in any proper sense, to render them 'unfit for cultivation.' The law contemplates such long-continued overflow or freshets only as would totally destroy crops, and prevent the raising of them without artificial means by levees, etc., such as are found on the Mississippi river. Second. Bodies of land covered by shallow lakes or ponds, which may become dry by evaporation, or other natural causes, do not come within the meaning of the swamp grant. Third. Testimony now, after the lapse of 9 years, to be available, must be explicit, resting upon the personal and exact knowledge of the localities claimed, and must relate to each quarter, quarter section, or other equivalent legal subdivision. This testimony must be made by parties having no interest, present or prospective, direct or indirect, and must state the name of the river or water course whereby the lands are submerged and rendered useless for arable purposes in their natural condition. Fourth. I inclose herewith a blank form of proof which you will require from the state authorities, and if lists of lands of this class are furnished you, accompanied with such evidence, you will report them to this office, in the manner set forth in form B herewith, after making a careful examination of said proof, and rendering your own decision thereon, as to whether the several tracts are swamp or not, within the meaning of the grant. Fifth. You will, as soon as your report is arranged and prepared for transmission to this office, send simultaneously a copy thereof to the local offices of the proper land districts, with instructions to them to enter the tracts in the usual form in their books, and to withhold them from sale or other disposition, unless otherwise especially directed by this office. Be pleased to acknowledge the receipt thereof."

At the time this letter was written the original lists made out by the agents of Kossuth and Palo Alto counties were on file in the office of the surveyor general of Iowa, and had not been acted upon at all by the Secretary of the Interior. The letter makes no direct reference to the copies of the lists, which before that time had been sent to the General Land Office, but it seems to carry intrinsic evidence of disapproval of the perfunctory showing made by the agents of the counties just referred to. Whether in the light of this showing, or for other reasons, it clearly appears that the land commissioner desired explicit evidence of persons possessing exact knowledge of the character of each particular tract claimed to be swamp and overflowed, before he would take action.

The record discloses no action taken after the writing of this last letter of instruction until 1872. Not only is there no evidence of any action taken by the Land Department, but it is stipulated of record that the swamp land selections for Kossuth, Palo Alto, and Dickinson counties "were never adopted, ratified, or confirmed in any manner by the Interior or Land Department of the government, but remained pending and undetermined therein down to the year 1876," when after a full hearing they were disapproved, and the lands found and adjudged not to have been swamp or overflowed lands, and not to have passed to the state by the act of 1850. In view of these facts, which conclusively show that the state never took any title to the lands in question, and that they, in fact, belonged to the railway company by virtue of its grant in 1864, the United States must rely exclusively upon the action of the county courts of Iowa in appointing agents to select and make lists of the lands claimed to be swamp and overflowed lands, the filing of those lists with the surveyor general for the state, and the transmission by him of certified copies thereof to the General Land Office at Washington, to work a segregation of the lands from the public domain, and a withdrawal of them from sale pending an inquiry into the merits of the state's claim.

Were they withdrawn from sale by reason of the acts just recited? Counsel for the United States maintain the affirmative of this question, upon the authority of several cases called to our attention, notably Newhall v. Sanger, 92 U. S. 761, 23 L. Ed. 769; Kansas Pacific Railroad Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122; Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. 985, 30 L. Ed. 1039; Hastings, etc., Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363; Whitney v. Taylor, 158 U. S. 85, 15 Sup. Ct. 796, 39 L. Ed. 906; Southern Pacific Railroad Co. v. United States, 200 U. S. 354, 26 Sup. Ct. 298, 50 L. Ed. 512; Michigan Land & Lumber Co. v. Rust, supra. In Newhall v. Sanger it was held that lands, claimed under a Mexican or Spanish grant, the right to which was secured by treaty stipulation with Mexico, and which were under consideration by a commission, created by our government to determine the validity of such claims, were thereby segregated from the public domain, and did not pass by a railroad grant. Here was obviously involved a claim recognized by our government, and one which was then actually sub judice. To the same effect is Southern Pacific Railroad Co. v. United States. In Kansas Pacific Railroad Co. v. Dunmeyer it was held that a homestead entry, made by a settler on the public lands and recognized by the proper land office before the filing of a map of definite location by a railroad company, which was the beneficiary of a grant, segregated the land entered upon from the public domain, so that it did not pass by the grant, even though the entry was abandoned after the filing of the map of definite location by the railroad company. Wright v. Roseberry discloses that the authorities of the state of California selected and designated the swamp lands there involved on a plat of a township made by the surveyor general of the United States; that the same was forwarded to the General Land Office pursuant to a requirement of a statute specially applicable, and was approved by the commissioner. Even with that recognition of the state's claim, which,

according to the authorities, at least amounted to a segregation of the land, it was held that the issue of a patent to a third party under the pre-emption laws of the United States on a claim initiated subsequent to the swamp land act was not necessarily void. The right of the parties was made to depend upon the question whether the lands were in fact swamp lands at the date of the act of 1850, and that issue was authorized to be submitted to a jury. The court said:

"If they are proved to have been such lands at that date, they were not afterwards subject to a pre-emption by settlers."

In Hastings, etc., Railroad Co. v. Whitney it was held that a homestead entry, which had been allowed to be made by the register and receiver of a land office, although it turned out to be void, segregated the land from the public domain. In that case the fees were paid by the entryman, and the entry was properly noted on the tractbooks of the land office. The recognition of the claim of the settler by the land office was held to constitute a segregation from the public domain, so as to exclude the land entered upon from a subsequent land grant in aid of a railroad. In Whitney v. Taylor it was held that a pre-emption entry, in which the claimant had filed a declaratory statement, paid the fees required by law in such cases, and secured a notation of the statement in the tractbooks of the proper land office, operated, though the entry was afterwards canceled, to prevent passing of title by a grant subsequently made to a railroad company. It was held that the land was effectually segregated from the public domain, by the recognition of the entry as made, by the land office. Michigan Land & Lumber Co. v. Rust discloses a recognition by the Land Department of certain surveys, which were relied upon by the state as determining its right to certain swamp and overflowed lands. It there appears that a list of those lands had been made out according to a certain resurvey which had been ordered, made, and approved by the Secretary of the Interior, and that patents had issued accordingly. It was held that this amounted to a final adjustment of the grant on the terms of the new survey.

The foregoing cases fairly represent the authorities relied on by the United States in support of their contention that the lands in question were, by reason of the claim made by the state to them, segregated from the public domain before the land grant of 1864 took effect, and therefore did not pass by that grant. These cases, in our opinion, fail to sustain that contention. They all disclose an assertion of a right to certain land by claimants which was recognized in some manner by the Land Department. We understand the crucial test of segregation is found in such recognition. The right or claim, in order to constitute a segregation, must be such as in some manner either by receipt of fees for entry, permission to file upon the land, noting the filing upon tractbooks, submission to a commission under treaty obligation or other like affirmative action of the Land Department, discloses a recognition of the claim, or discloses some privity between the claimant and the United States. This court has heretofore held that an equitable right to land can prevail over the legal title only—

"when the former had either been recognized by the United States by a grant or an entry of the land or by the acceptance of payment for it, so that the equitable owner was in privity with the government, or the equitable right had been initiated before the claim which went to patent by a settlement or improvement of the land, under a law which gave the settler or improver a right to be preferred in its acquisition." Deweese v. Reinhard, 61 Fed. 777, 781, 10 C. C. A. 55; Hartman v. Warren, 76 Fed. 157, 160, 22 C. C. A. 30; New Dunderberg Min. Co. v. Old, 79 Fed. 598, 606, 25 C. C. A. 116; James v. Germania Iron Co., 107 Fed. 597, 603, 46 C. C. A. 476.

In view of the foregoing authorities we think the mere assertion of a claim to land, unrecognized by the Land Department of the government in any manner, cannot operate to reserve or segregate it from the public domain so as to prevent disposition of it by the United States. The consequence of any other doctrine condemns it. If a state can claim any land, and by the mere fact of claiming it prevent any subsequent disposition of it, it could claim all lands, and thereby prevent disposition of any and all the public domain. The improbability of such conduct on the part of a state does not withdraw its possibility from legitimate consideration. We are not prepared to give our sanction to a rule that would permit this blockade upon settlement and enterprise.

This case, we think, is clearly brought within the rule just stated. It involves a claim by the state, to which the Land Department had given no sanction. The method of giving such sanction, specially provided by section 2 of the swamp land act as interpreted by the Supreme Court, was by judicially determining the fact that the lands claimed were swamp and overflowed lands. This was never done. On the contrary it was finally and conclusively decided they were not of that character. The surveyor general of Iowa had received lists of lands claimed to be swamp lands by agents of the several counties interested, and had forwarded copies of them to the Land Department for its information only. These lists had obviously been deposited with the surveyor by the state's agents as a step to secure the "proper recognition" of them by the Land Department, acknowledged to be necessary by the Iowa act of 1853. But the surveyor had no judicial function to discharge in the matter. He could only forward the pretensions of the state to the head of the Land Department which alone had power to act in the premises. Barden v. Northern Pacific Railroad, supra.

The act of March 3, 1857 (11 Stat. 251, c. 117), cannot be invoked to give force or effect to the selection of lands made by the state in this case. That was an act inspired by the inaction of the Secretary of the Interior in making out lists of swamp and overflowed lands, and it was obviously intended to aid the states in securing a recognition of selections which they might have made before then. It provided that any selection "heretofore made and reported to the Commissioner of the General Land Office" be confirmed and approved, etc. As no steps had been taken by the state to make selection of the lands in controversy until after the act in question took effect, it can have no bearing on this case, and no further consideration of it is required.

Conceding, without admitting, that there might have been a technical segregation of the lands in question pending an inquiry into the merits of the state's claim, we are impressed with the want of equity in favor

of the United States in this case. The lands in question, not having been swamp and overflowed lands in fact, as was finally and conclusively established by the Secretary of the Interior, passed by the terms of the grant of 1864 to the railway company and its grantees. They belonged to them in equity, if not at law. If they in contemplation of law were reserved from sale, the right of selection of other lands in lieu of them was conferred by the act. The right of selection was intended to be of equal value to the right lost by the supposed reservation. The right of selection never having been exercised, the United States lost nothing by issuing patents of the land in controversy to the state, for the benefit of the railway company. This was done in 1880 and 1881. Since then most, if not all, of the lands have been sold and conveyed to numerous purchasers of small tracts, who bought them in good faith and for value. Twenty-five years or more of quiet enjoyment of the land in question have now elapsed. No fraud or unfair practices in any stage of the proceedings leading up to the final patents are charged against the railway company or any persons acting for it. In such circumstances, it would, in our opinion, be inequitable and conducive of no good results to grant the relief sought by this bill.

The decree of the circuit court dismissing the bill of complaint was correct, and is accordingly affirmed.