## KITTEL v. TRUSTEES OF INTERNAL IMPROVEMENT FUND OF FLORIDA.

### (Circuit Court, N. D. Florida.  June 21, 1905.)

**1. PUBLIC LAND—LEGISLATIVE LAND GRANTS.**

The Legislature of Florida, under the act of Congress of September 28, 1850 (9 Stat. 519, c. 134), known as the "Swamp and Overflowed Land Act," had the right to deal with all swamp and overflowed lands within the boundaries of the state, and to grant the same in trust or otherwise, before identification and patent to it by the United States, subject to the right of the Secretary of the Interior to determine what lands were embraced in the provisions of said act.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 193.]

**2. SAME—SWAMP AND OVERFLOWED LANDS.**

The act of Congress of September 28, 1850 (9 Stat. 519, c. 134), known as the "Swamp and Overflowed Land Act," is a grant in præsenti of the equitable title to all the swamp and overflowed lands within the boundary of any state then in existence, and to perfect the legal title thereto it was necessary that the Secretary of the Interior, at the request of the Governor, should cause a patent to be issued to the state therefor, and on that patent the fee simple to said lands was vested in the state, and which fee-simple title related back and took effect as of the date of the passage of said swamp land grant act.

**3. STATES—INTERNAL IMPROVEMENT FUND—POWERS OF TRUSTEES AND OF SUBSEQUENT LEGISLATURES.**

Under the act of the Legislature of Florida of January 6, 1855 (Laws 1854–55, p. 9, c. 610), known as the "Internal Improvement Fund Act," creating trustees, consisting of the Governor, Comptroller, Treasurer, Attorney General, and Secretary of Agriculture (by subsequent amendment), to hold the same in trust for the uses and purposes provided for therein by said act, it was competent for said trustees to recognize and make effective a railroad land grant passed by said Legislature in 1883, not strictly in conformity with the provisions of the internal improvement fund act, and a certificate containing a promise to make deeds when the patents were received from the United States will be enforced in a proceeding for specific performance.

**4. ESTOPPEL OF RECORD.**

When the trustees of the internal improvement fund of Florida have been joined as defendants in an action to foreclose a mortgage given by a railroad company, and among other property covered by the mortgage was a certificate from said trustees reciting the act of Congress relating to swamp lands, the acceptance of this act by the state of Florida, the act creating the board of trustees of the internal improvement fund, and an act of the Legislature making a grant of land in aid of the construction of said railroad, passed subsequent to the act creating the board, and a promise by the trustees to comply with the last-mentioned act by making deeds when patents to the lands set forth in said certificate (which were stated to be, in their opinion, covered by the swamp land grant act), should be received from the United States. The trustees made answer in said suit, and alleged, among other things, that it was their intention to comply with said certificate when patents for said lands should be issued to the state. *Held,* that the trustees in this suit are estopped of record from setting up that the state of Florida, and themselves as trustees, had not at the time of making said certificate any title or interest which they could convey or contract in relation to; that they are further estopped of record from asserting their lack of authority to make said certificate.

(Syllabus by the Court.)

In Equity.  Argument on demurrer to bill.

The bill of complaint filed in this case primarily seeks relief by way of specific performance of a contract entered into between the trustees of the internal improvement fund of the state of Florida and the predecessor in title to complainant, the Augusta, Tallahassee & Gulf Railroad Company. Incidentally the bill seeks an injunction restraining the defendants from in any way or manner conveying the lands in controversy, or attempting to sell them, and from incumbering them temporarily as well as permanently.

The material allegations of complainant's bill may be succinctly stated as follows:

(1)    The execution and delivery of a certificate (designated in the bill as a contract) by the defendants' predecessors in office, defendants holding in virtue of their office, which certificate recites the passage of an act of the Legislature of the state of Florida approved February 7, 1883, hereinafter referred to as "An act to aid the construction of the Thomasville, Tallahassee & Gulf Railroad Company" (Laws 1883, p. 114, c. 3494); the construction of the said railroad under and in conformity to the provisions of the said act of 10 miles of said road extending from Carrabelle northeasterly; that the said railroad had made application to the trustees of the internal improvement fund for a conveyance of the lands to said company; and that certain lands described in said certificate are believed and claimed to be those granted to the state of Florida by the act of Congress approved September 28, 1850 (9 Stat. 519, c. 134), but which had not been patented to the said state, and which certificate concludes with the following paragraph:

"Now, therefore, the undersigned, the trustees of the internal improvement fund of the state of Florida, in consideration of the premises, and in conformity to the acts of the Legislature aforesaid, do hereby certify that the said Augusta, Tallahassee & Gulf Railroad Company is entitled to said lands whenever the same shall have been patented to the state of Florida under the said act of Congress of September 28, 1850, and that upon the receipt of said patents by the state the said trustees, or their successors, will convey the said lands to the said company, its successors and assigns, saving the rights of actual settlers on said lands acquired at or before the date thereof," etc.

That the Augusta, Tallahassee & Gulf Railroad Company succeeded to the rights of the original grantee, the lands in question belonging to the swamp and overflowed class, under the act of Congress of September 28, 1850, but had not been patented. That the railroad had made application for conveyance thereof, and that said lands were believed and claimed to be of those granted to the state of Forida by the act of Congress of September 28, 1850.

(a)    "Complainant refers in her bill of complaint to the act of the Legislature of the 6th day of January, 1855 (Laws 1854–55, p. 9, c. 610), which created the board of trustees, the defendants herein, and by express reference thereto makes such act a part of the bill of complaint."

(b)    "Complainant specifically alleges that these defendants hold the lands, except as to those portions which have been from time to time conveyed by them, 'and who hold the same in the course of the administration of their trust, with full power and authority thereof.' "

(c)    "Complainant specifically alleges that the Augusta, Tallahassee & Gulf Railroad Company had proceeded under the grant to it, and finished sufficient road to entitle it to 108,000 acres, 'and which railroad so constructed was investigated, examined, and approved as to its completion by the said defendants, the board of trustees of the internal improvement fund of the state of Florida.' "

(d)    "That on said approval thereof said Augusta, Tallahassee & Gulf Railroad Company applied to said board of internal improvement fund for a certificate declaring, admitting, and certifying that said Augusta, Tallahassee & Gulf Railroad Company had earned said lands by the completion of sufficient road to entitle it thereto from the town or place known as Carrabelle, in Florida, northward toward Thomasville, in the state of Georgia, and thereupon a resolution was duly submitted and carried by said board of internal improvement fund commission directing said certificate to be prepared and issued."

(e) Complainant sets forth the minutes in the bill of complaint under which action was taken by the board of trustees.

It recites the application for the grant to the board; that 10 miles of road had been constructed, examined, and approved, and order for the preparation of the certificates to the road for 150,000 acres of unplanted lands lying within the territorial limit prescribed by the legislative grant to the company.

The act of September 28, 1850 (9 Stat. 519, c. 134), reads as follows:

"An act to enable the state of Arkansas and other states to reclaim the 'swamp lands' within their limits.

"Be it enacted by the Senate and House of Representatives of the United States in Congress assembled, that to enable the state of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are hereby granted to said state."

"Sec. 2. And be it further enacted, that it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the Governor of the state of Arkansas, and at the request of said Governor, cause a patent to be issued to the state therefor; and on that patent, the fee simple to the lands shall vest in the said state of Arkansas, subject to the disposal of the Legislature thereof; provided, however, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid.

"Sec. 3. And be it further enacted, that in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is 'wet and unfit for cultivation,' shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.

"Sec. 4. And be it further enacted, that the provisions of this act be extended to, and their benefits be conferred upon, each of the other states of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated."

The General Assembly of the state of Florida in 1879 adopted a resolution on the subject of these lands, in part as follows:

"Resolved, (1) That the grant by Congress of the swamp and overflowed lands to the state of Florida, September 28, 1850, and the acceptance of the same by the state, imposed upon the state the trust and duty of appropriating said lands to the objects and purposes of said grant as set forth and expressed in the act of Congress granting the same.

"(2) That any appropriation or disposition of said lands to other and different purposes and uses than those expressed in the grant is a violation thereof to the extent of such misappropriation, and is an infringement of the contract between the United States and the state of Florida, and to such an extent is void."

Assembly Journal, 412.

The committee to which this resolution had been referred reported in part as follows:

"By the express terms of the act of Congress, these lands were made subject to the disposal of the Legislature, but with the plain, clear, and unambiguous proviso that the proceeds of said lands, whether from sale or direct appropriation in kind, should be applied exclusively, as far as necessary, to the purpose of reclaiming said lands."

"On the 24th of January, 1851, the Governor of the state of Florida approved an act of the Legislature entitled 'An act to secure the swamp and overflowed lands lately granted to the state, and for other purposes,' in which it is provided 'that the Governor is authorized and hereby requested to take such measures as to him may seem expedient and most to the interests of this state, in securing and classifying the lands lately granted to this state,

designated as "swamp or overflowed lands," and that the plats of said land, as soon as secured, shall be delivered to the register of this state,. and said lands shall be subject to sale under the same rules, regulations and restrictions as are now, or may hereafter be, imposed upon the sale of seminary lands.' Chapter 332, p. 93, Laws of Florida."

The same act created a "board of internal improvement for the state of Florida," to consist of certain officers and one member from each judicial district, to be elected by the General Assembly, to serve for two years, and required that they should hold an annual meeting on the first Monday in December in each year. Section 3.

"On January 10, 1853, the Governor of the state of Florida approved an act of the Legislature entitled 'An act to amend "An act to secure the swamp and overflowed lands lately granted to the state, arid for other purposes,"' in which it was provided that the third section of the act of January 24, 1851, be repealed, and there was created a board of internal improvement for the state of Florida, to consist of the State Engineer, as president, and eight commissioners, to be elected by the General Assembly, to hold their office for four years; that they shall determine upon and recommend plans for the reclamation of swamp lands, and appraise the value of said lands, to be laid before the General Assembly for its action; that the commissioners should receive from the swamp land fund the same per diem and mileage as members of the General Assembly; that the Governor, with the consent of the board of internal improvement, may authorize the State Engineer to contract to reclaim swamp lands for a portion thereof, not exceeding one-half of said lands so reclaimed. Chapter 496, p. 75, Laws of Florida."

"On January 8, 1853, the Governor approved an act of the Legislature entitled 'An act to establish the office of State Engineer and Geologist,' in which it is provided 'that it shall be the duty of the State Engineer to examine and survey the said lands of the state, for the purpose of their reclamation, and make the necessary maps, plats and estimates for said work, to be laid before the General Assembly for their action'; that the State Engineer shall receive, from the proceeds of the sale of the swamp lands, an annual salary not exceeding two thousand dollars, and all necessary expenses. Chapter 497, p. 77, Laws of Florida."

"On December 31, 1852, the Governor approved an act of the Legislature in which it was provided 'that those who reclaim and bring into cultivation lands granted to the state by an act of Congress entitled "An act to enable the state of Arkansas and others to reclaim the swamp lands within their limits," shall be entitled to the full privileges of pre-emption rights, without any restriction as to their owning one hundred and sixty acres, or having had the benefit of a former pre-emption right.' Chapter 499, p. 78, Laws of Florida."

"On January 14, 1853, the Governor approved a resolution of the Legislature entitled 'Resolution relative to the overflowed lands of St. Lucie county,' in which it was provided that it shall be the duty of the State Engineer forthwith to examine and report to the Governor upon the practicability of draining the submerged lands in the rear of St. Lucie Sound; that the sum of three thousand dollars, to be paid from the sale of swamp and overflowed lands, are appropriated for the object contemplated. Resolution No. 3."

"In accordance with the requirements of the act of January 10, 1853, the board of internal improvement, on December 22, 1854, reported to the Legislature, through the Governor, that they recommended the granting of alternate sections to aid in the construction of railroads where the roads pass through the lands, to the extent usually granted by Congress, and with such limitations as would prevent any title passing until the roads would well justify the contribution proposed; and it may be well to reserve to the state the power to do the same in the case of future charters (page 142); that they recommended that the lands be vested in trustees consisting of the Governor, Comptroller, Treasurer, and Attorney General, and that they adopt suitable plans for drainage (page 144); that the board have prepared a bill that will carry out the views they present, and which was submitted as a part of their report. They 'recommend that the board, being no longer necessary if the

proposed plan is adopted, be abolished as a board.' House Journ. 1854, p. 134 et seq. The bill proposed by the board of internal improvement was enacted into law, approved January 6, 1855, and became chapter 610, p, 9. of the Laws of Florida."

"The state of Florida possessed no lands except such as might be granted to it by the United States government. The United States government had a right to make such grants for specific purposes, and we find that grants of land were so made as follows: September 4, 1841, 500,000 acres for internal improvements, roads, railways, bridges, canals; March 3, 1845, for the seat of government, public schools, seminaries, and education; September 28, 1850, for the purposes of draining and reclaiming; May 17, 1856, for the construction of railroads."

"Desiring to accept the grant of these lands upon the conditions stated in the act of September 28, 1850, and for the purpose of carrying out those conditions, the Legislature of the state of Florida, after full and thorough consideration, shown by the journal of the proceedings of that Legislature, the messages of the then Governor of the state upon the subject, and the reports of committees, submitted to that Legislature on this subject, the act approved January 6, 1855, was adopted. That act consists of 32 sections. Section 1 provides that so much of the 500,000 acres of land granted for internal improvement purposes by the act of Congress of March 3, 1845 (5 Stat. 788, c. 75), as remain unsold, and the proceeds of such lands as were theretofore sold and on hand, and all proceeds that may thereafter accrue from the sales of said lands; also all the swamp lands granted by the act of September 28, 1850, and the proceeds that have accrued or may hereafter accrue from the sale of said lands—are set apart and declared a distinct and separate fund to be called the 'Internal Improvement Fund of the State of Florida,' and are to be strictly applied according to the provisions of this act. Section 2 (page 10) provides that 'said lands and all the funds arising from the sale thereof are hereby irrevocably vested in five trustees, to-wit: the Governor, the Comptroller, the State Treasurer, the Attorney General and the Register of State Lands, and their successors in office, to hold the same in trust for the uses and purposes hereinafter provided, with the power to sell and transfer said lands to the purchasers and receive payment for the same.' The other sections of the act relate to a system of railroads recommended to the trustees as proper improvements to be aided from the internal improvement fund in the manner therein provided, except section 17 (page 15), in reference to constructing a canal, and except sections 16 and 29 (pages 15, 19), which are as follows:

" 'Sec. 16. Be it further enacted, that the trustees of the internal improvement fund shall hereafter fix the price of the public lands included in the trust, having due regard to their location, value for agricultural purposes, or on account of timber or naval stores, and make such arrangements for the drainage of the swamp or overflowed lands, as in their judgment may be most advantageous to the internal improvement fund and the settlement and cultivation of the land, and the said trustees shall encourage actual settlement and cultivation of said lands by allowing pre-emptions under such rules and regulations as they may deem advisable: provided, that in no case shall a pre-emption for more than one section of land be granted to any one settler.'

" 'Sec. 29. Be it further enacted, that the alternate sections of the swamp and overflowed lands for six miles on each side may be granted by the General Assembly to such railroad companies, to be hereafter chartered, as they may deem proper, on their compliance with the provisions of this act, as to the manner of constructing the road and drainage, and the sale and transfer of the alternate sections thus granted shall be in accordance with the provisions of this act.' "

The defendants demurred to the bill of complaint upon 15 different grounds. Their contentions, however, may be grouped into three propositions, as follows:

"(1) The act of Congress of September 28, 1850, was not an act which vested the title in the state of Florida to the swamp and overflowed lands of the class therein described in præsenti, but that title thereto did not vest in the state of Florida until actual selection, approval, and the issue of a

139 F.—60

patent by the United States government, acting through the Interior Department, to the state of Florida.

"(2) That, inasmuch as the state of Florida had not the title at the time of the creation of the board of internal improvement fund commission, that such title was not vested in said board of internal improvement fund commission, and for which reason certificate No. 13,909 was invalid, and of no force and binding effect upon the present board of trustees. And

"(3) That, in view of the contentions (1 and 2) herein stated, the present board of trustees has full and complete discretion with respect to any prior certificates made by the board of trustees of any of these lands to exercise its own judgment in the premises, and refuse or grant the request of petitioner."

In the argument on this demurrer, the complainant has met those three propositions by three counter propositions, as follows:

"First. That the act of September 28, 1850, was an act vesting in the state of Florida the title to the swamp and overflowed lands within the description of said act in præsenti; and

"Second. That so far as the selection, approval, and the patenting by the general government through the Department of the Interior is concerned, the effect thereof was merely to identify by boundaries and descriptions, and determine the question of what lands were within the description of the act, and did not effect the vesting of the title; and

"Third. That whether the title under the act of September 28, 1850, was in præsenti thereunder or not, this board is estopped from denying that complainant is entitled to the land in question by virtue of the facts herein and hereinafter to be stated, because by the act of the Legislature of Florida of January 6, 1855, creating this board, the legal title passed to the board of trustees to every acre of land that was swamp and overflowed land in point of fact, and by virtue of the attitude of such board in the case of Kittel against the Augusta, Tallahassee & Gulf Railroad Company and such board itself it is concluded, as a matter of record, from questioning complainant's right to the conveyance sought."

In addition to these three main propositions urged, the defendants, in their demurrer and brief, have submitted the following propositions:

"(4) The act of the Legislature of the state of Florida of February 7, 1883, making a grant of certain lands to the complainant's predecessor in title, is void and ineffectual so far as it relates to swamp and overflowed lands, in that it does not provide for their drainage and reclamation, and because at the time mentioned and ever since the title to said lands was and has been in the trustees, charged with duties in reference to said lands, and such title was not then in the state, and the Legislature of 1883 had no power or authority to direct the trustees to make deeds purporting to convey title to the swamp and overflowed lands in said trust.

"(5) That the act of 1883 is subject to the rights of creditors of the trustees to the trusts of said fund, viz., draining and reclaiming the swamp and overflowed lands; to control, management, and sale, and application of said fund and the lands by the trustees."

These two propositions are met by complainant as follows:

"(a) The trustees of the internal improvement fund, being the creatures of the Legislature of the state of Florida, and having their duties and powers defined by the act creating them, cannot set up the defense that the Legislature has no power to deal with the swamp and overflowed lands because such dealing contravenes the act of Congress; that it was not for them to say that the state has violated the obligations imposed upon it by the act of Congress; that it is a question between the United States and the state, and not a question between the state and a creature of its legislation.

"(b) The vesting of the lands in the trustees by the internal improvement act is not irrevocable, though in express language stated to be. The act of one Legislature cannot bind a subsequent one, unless some constitutional limitation and restriction arising under the former legislation is violated by the latter act. That the internal improvement act is not organic law. That the trustees were merely agents of the state, invested with the legal

title of the lands for their more convenient administration. That the state remained in every respect the beneficiary proprietor, subject to the guaranties which had been made to the holders of railroad bonds secured thereby."

Straley & Hasbrouck and Fred T. Myers, for complainant.
R. W. Williams and W. B. Farley, for defendants.

SWAYNE, District Judge (after stating the case). Considering the first proposition, relating to the act of Congress of September 28, 1850 (9 Stat. 519, c. 134), and reviewing the long line of authorities presented, there seems to be absolute harmony upon two questions involved in the first proposition.

In French v. Fyan et al., 93 U. S. 169, 23 L. Ed. 812, the court say:

"This court has decided more than once that the swamp land act was a grant in præsenti by which the title to those lands passed at once to the state in which they lay, except as to states admitted to the Union after its passage. The patent therefor, which is the evidence that the lands contained in it had been identified as swamp lands under that act, relates back and gives certainty to the title of the date of the grant."

And in Rice v. Sioux City & St. Paul Railroad Company, 110 U. S. 695, 4 Sup. Ct. 177, 28 L. Ed. 289:

"That the swamp land act of 1850 operated as a grant in præsenti to the states then in existence of all the swamp lands in their respective jurisdictions is well settled."

And in Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. 985, 30 L. Ed. 1039:

"The grant by the United States of land to aid in the construction of railroads, in relation to which we have had many cases before us, is in many particulars analogous to the grant by the swamp land act. They are usually of a specific number of sections of land on each side of the proposed route of the road, with a reservation of certain sales or of other disposition made before the road became definitely fixed. The usual words of grant in such cases are similar to those in the swamp land act: 'There is hereby granted.' Though it is impossible to locate the land granted until the road is fixed, yet when that is fixed the grant takes effect as of the date of the act. * * * It is plain that the difficulty of identifying the swamp and overflowed lands could not be defeated through error of the granting clause on whomsoever such identification was required to be made. When identified, the title would perfect as of the date of the act. The patent would be evidence of such identification, and declaratory of title conveyed. * * * The result of these decisions is that the grant of 1850 is one in præsenti, passing the title to the land as of its date, but requiring identification of the lands to render the title perfect. * * * For the error in holding that the certificate of the commissioner was necessary to pass the title of the demanded premises to the state, the case must go back for a new trial, when the parties will be at liberty to show whether or not the lands in controversy were in fact swamp and overflowed at the date that the swamp land act of 1850 took effect. If they are proved to have been such lands at that date, they were not afterwards subject to pre-emption by settlers. They were not afterwards public lands at the disposal of the United States. Parties settling upon such lands must be deemed to have done so with notice of the title of the state, and after the segregation map was deposited with the Surveyor General of the state, with notice also that they were actually segregated and claimed by the state as such."

In Tubbs v. Wilhoit, 138 U. S. 134, 11 Sup. Ct 279, 34 L. Ed. 887:

"The swamp land granted on September 28, 1850, to the several states was in præsenti, and upon identification of the lands therein in lawful mode title thereto related back to the date of the grant."

In the Rogers Locomotive Machine Works v. American Emigrant Company, 164 U. S. 559, 17 Sup. Ct. 188, 41 L. Ed. 552:

"That where the lands in controversy were swamp and overflowed lands within the meaning of the act of 1850 was to be determined in the first instance by the Secretary of the Interior, and that when he identified lands as embraced by that act, and not before, the state was entitled to the patent, and on said patent the fee-simple title vested in the state, and what was before inchoate title then became perfect as of the date of the act."

Michigan Land & Lumber Company v. Rust, 168 U. S. 589, 18 Sup. Ct. 208, 42 L. Ed. 591:

"The act of September 28, 1850, granting certain lands to the several states, was a grant in præsenti, passing title to all lands which at that date were swamp lands, but leaving to the Secretary of the Interior to determine and identify what lands were and what lands were not swamp lands."

Brown v. Hitchcock, 173 U. S. 473, 19 Sup. Ct. 485, 43 L. Ed. 772:

"Under the act of September 28, 1850, known as the 'Swamp Land Act,' the legal title to land passed only on the delivery of a patent, and as the record in this case discloses no patent there was no passing of the legal title from the United States, whatever equitable rights may have vested. Until the legal title to land passed from the government, inquiry as to equitable rights comes within the cognizance of the Land Department."

A careful inquiry into the status of these lands is necessary in view of the complainant's demand for a decree that the defendants, the trustees, execute a deed conveying the title to the lands described, and also for unpatented lands when they shall be patented by the United States. The complainant admits that at the time of the alleged grant by the Legislature of the state of Florida and at the time of the alleged certificate the state and the trustees had no title to said lands other than that contained in the act of September 28, 1850; that the United States, through its constituted authorities, had not then identified and patented the said lands. If the state had no title, either legal or equitable, it could not make such grant by legislative act, and would not be bound at a subsequent date, having acquired the legal title in the interim, to make good a prior grant of something it had not. From an analysis of the above decisions these propositions are apparently well defined, viz.: (1) The act of September 28, 1850, known as the "Swamp Land Grant Act," is a grant in præsenti of the equitable title to all the swamp and overflowed lands within the boundary of any state then in existence. (2) That to perfect the legal title thereto it was necessary that the Secretary of the Interior, at the request of the Governor, should cause a patent to be issued to the state therefor, and on that patent the fee simple to said lands was vested in the said state. (3) That upon the vesting of the legal title it should relate back and have effect as of September 28, 1850. These three conclusions seem to effectually dispose of the first and second contentions of the defendants, as it is alleged and stated that the state now has the actual legal title to a large portion of the lands claimed in the bill. For all intents and purposes that title has existed since

September 28, 1850, and the state, in dealing with its equitable title, clearly conveyed under the act of September 28, 1850, could not be heard to say that it had no title to grant to the complainant's predecessors in title under the act to aid the construction of the Thomasville, Tallahassee & Gulf Railroad Company, or at the time of the passage of the act creating the board of internal improvement fund commission.

The legal and political status of the board of trustees of the internal improvement fund of the state of Florida is necessary to further consideration of the questions involved on demurrer. Under the act of January 6, 1855 (Laws 1854–55, p. 9, c. 610), above referred to, it is contended by the trustees that the General Assembly had no power to withdraw any portion of the fund after enacting the above act; that the state is as capable of making a contract as an individual, and, when made, is bound by it; that the legislative department can constitutionally pass no law impairing the obligations of its contracts, and when it attempts to do so it is the solemn duty of the judicial department to declare such law null and void. And it is also further contended: That when the General Assembly of 1855 conveyed the internal improvement fund to trustees for the benefit of purchasers and holders of bonds to be issued under it, and for other purposes therein named, they made a law in the nature of a contract. The act of 1861 is an attempt to repeal the act of 1855, and in so far as it seeks to divest the internal improvement fund from the purposes therein indicated could not be done. That when the right to property is vested by grant for particular purposes by legislative authority, or otherwise, the Legislature could not vest it for another purpose. The Legislature having declared the purposes to which the subject-matter of the grant applied, the legislative power over it was exhausted, and it cannot by legislative grant be appropriated for other and different purposes. That the lands granted to the state of Florida by the act of September 28, 1850, came to the state as a sacred trust, to be applied exclusively as far as necessary, for the reclamation and drainage of those lands, and that the state had no power to sell or donate these lands other than discharging the sacred trust imposed by the grant from the federal government, nor had the state the power to divert them to its use in payment of ordinary expenses or otherwise. That the act of the Legislature creating the internal improvement fund then became an executed contract, and extinguished the right of the state. The act of 1883, so far as it attempts to grant the swamp land to the Florida, Tallahassee & Gulf Railroad Company, was an attempt to impair the estate of the grantees in the act of 1855.

These several questions may be well answered by an examination of the case of the Trustees of the Internal Improvement Fund v. the St. Johns Railway Company, 16 Fla 531, which contains an exhaustive and able interpretation of this act by the Supreme Court of the state construing an act of the Legislature of Florida, which in that respect is binding upon this court, as many of the questions

therein involved are along parallel lines with those above enumerated; and in view of the fact that this is the third time these propositions have been argued to this court liberal excerpts from that opinion would seem to be justified here.

"There are two questions involved in this case:

"First. Whether the thirteenth section of the St. Johns Railway charter (Laws 1858–59, p. 95, c. 936) granting swamp and overflowed lands to this company is unconstitutional, as impairing the obligation of contracts arising under the internal improvement act of January 6, 1855 (Laws 1854–55, p. 9, c. 610).

"Second. Whether the St. Johns Railway was constituted in accordance with the provisions and specifications of the internal improvement act; and if not, whether the doing of this was a condition precedent upon which the grant to it should take effect.

"From this case we see that it was the opinion of the Supreme Court of the United States that any disposition of the lands for objects and purposes other than those of the grant, and in such manner as to defeat these, would be a violation of this contract. This leads to the inquiry whether the act of the Legislature consolidating them with the lands granted to the state for internal improvement purposes, and vesting them in trust under the second section, was enacted with a view and intention of carrying into effect the contract entered into under the act of Congress. It cannot be supposed that the Legislature by this act intended to violate this contract, but it must be assumed that the contrary was their intention.

"By referring to the act of Congress, we find that the object of the grant was to enable the states to reclaim these lands for settlement and cultivation and the means of doing this, as pointed out in the act, was by the use of the proceeds of these lands or the appropriation of the lands in kind. The only condition annexed to the grant was that they should be applied exclusively, so far as necessary, to the purpose of reclaiming said lands by levees and drains. Wherever these means were not necessary, a full discretion was left to the states in the choice of other means, not inconsistent with the grant, which they might deem most appropriate to carry into effect its object. Some of them might be best reclaimed by means of drains, some by levees, and some by both combined. But the states in which they were situated were necessarily to be the judges and to have the power of determining the necessity of either or both modes, or whether the object could be better accomplished to any extent by other methods.

"It is true that the leading object of the Legislature in passing this act seems to have been to provide for and encourage a liberal system of internal improvements in this state, and for this purpose they set apart all of the internal improvement and swamp and overflowed lands acquired by the grant, and declared them to be a separate and distinct fund, to be strictly applied according to the provisions of the act. (Section 1.) For the purpose of assuring a proper application of this fund for the purposes therein declared, they vested these lands in five trustees by the second section, to be held by them in trust for the uses and purposes thereinafter provided. The leading and primary use and purpose thereinafter provided to which the fund was made applicable was to aid in the construction of those lines of road and canal mentioned in the fourth section (page 11), and which have been held by this court in all of its adjudications of this act to be a state system. The terms, conditions, and manner in which this aid should be extended to roads which might accept its provisions were prescribed in the act. Another use and purpose for which this fund was set apart and to which it was made applicable was that provided in the sixteenth section (page 15). Finally, these lands were to be applied in such manner as might be directed by the Legislature upon the contingencies mentioned in the twenty-seventh section (page 18). But all of these uses were intended to be subject to the power reserved to the General Assembly in the twenty-ninth section (page 19) of the act to grant alternate sections of the swamp and overflowed lands, for six miles on each side, to such railroads to be thereafter chartered, as they might deem proper.

"We have now the grant by Congress, its objects, and the legislative action and power over the subject, and we are of opinion that in passing this act the Legislature intended as one of its main objects to carry into effect the purposes of this grant. If this intention can be collected from the act, it must control its construction. That such was the intention is evident from the sixteenth section, which provides that 'the trustees shall make such arrangements for drainage of swamp and overflowed lands as in their judgment may be most advantageous to the internal improvement fund and the settlement and cultivation of the land.' This is one of the modes of reclaiming these lands pointed out in the act of Congress. This intention is further evident from the twenty-ninth section, in which the power to grant alternate sections is reserved to the General Assembly, which is limited to this class of lands granted by Congress, and must be construed in reference to this grant, and as one of the means of reclaiming it.

"It is clear from these provisions that the Legislature intended that the trust created by the second section of this act should be subject to, and to some extent controlled by, its subsequent provisions. * * *

"If correct in the position that the Legislature intended by this act to execute to some extent the contracts arising under the act of Congress, and that they intended that the trust created by the second section of the internal improvement act should be subject to, and to some extent controlled by, its subsequent provisions, then the importance of the reservation of the power over this subject in the twenty-ninth section becomes more striking and apparent as a necessary means of more carefully carrying into effect the purposes of the grant by Congress.

"It must be borne in mind that a very small portion of the lands vested in the trustees were donated for general improvement purposes, not exceeding five hundred thousand acres. Much the larger portion—probably nineteen-twentieths of them—was donated under the grant of the swamp and overflowed lands. When this vast domain is considered, much, if not most, of it lying out of the reach and beyond the influence for development of the great and leading works indicated in the fourth section, it would have been singular if some such power had not been reserved. No more efficient mode of reclaiming them could have been devised than that of constructing lines of railroad and canals through them, thus rendering them accessible to settlers, furnishing transportation for their productions, enhancing the value of the adjacent lands, and, making these available for the fund and leading purposes of the trust, which would otherwise be valueless to it; and as such works producing such results are ordinarily beyond the capacity of individual capital and enterprise, it was a wise provision of the act to reserve the power and authorize the use of these lands for such purposes by granting portions of them to corporations, which, by combination of capital, could more successfully accomplish those objects. Railroads, more than any other modern institution, are considered the great developers of new countries by hastening their settlement and rapid improvement, and in a state situated as a large portion of ours, with its greatly diversified climate and varied productions, but much of it inaccessible for want of transportation, no one can estimate the value which such works would add to these lands and the resulting advantages to the fund, to say nothing of their influence in sustaining the roads which were the primary object of the trust. This view of the law is sustained by sound reasoning, and no doubt influenced and controlled the body which devised and adopted the internal improvement act.

"The present is the first case in which the reserved power of the Legislature over this fund under the twenty-ninth section of the act has been brought in question.

"It is contended that the Legislature had no power to make the grant to the St. Johns Railway Company under the thirteenth section of its charter, because a previous Legislature had vested the lands so granted in the trustees of the internal improvement fund, and that they have become bound to the creditors of this fund by the terms of this contract, and that the thirteenth section is a diversion of a part of this fund from the purposes of the trust, and is therefore inoperative and void, because it impairs the obligation of said contract. * * *

"All of the lands vested in the trustees were pledged to the purposes of the trust, except such as the Legislature authorized to be otherwise applied; and these exceptions apply exclusively to the swamp and overflowed lands. These are the lands granted to the St. Johns Railway Company under the thirteenth section of its charter, and the grant is strictly within the limits and only of the lands named in the twenty-ninth section, which reserved the power to the Legislature to make the grant. If they vested in the trustees, they did so subject to this reserved power of the Legislature to dispose of them in the manner and for the purposes mentioned in the thirteenth section of this charter.

"This section is a contract between the state and the company, based upon a valuable consideration which the company has performed on its part, and the trust fund has derived its benefits in the enhanced value of the even sections which remain to the fund within the limits of the grant, which was a part of the consideration stipulated in the act. * * *

"So we think that the grant to the St. Johns Railway Company was but carrying out the true spirit and policy of the law on this subject, which we have seen was twofold—to reclaim these lands by granting the alternate sections as authorized by the twenty-ninth section, and by the use of this as one means to improve the trust estate in aid of the internal improvement system inaugurated by the act. * * * But the act incorporating this company did not bring it within the system provided by the internal improvement act. It was not required to accept its provisions, and, had it accepted them, it would not have made it a part of the system without some clause in its charter or special act authorizing it. It is outside of and independent of the system, and the internal improvement act is no part of its organic law, nor is it bound by any of its provisions. Its rights and powers are derived solely from its charter.

"The power of the Legislature reserved in the twenty-ninth section being an original power, not parted with, is not and could not be limited by the sixth section so as to prevent any future Legislature from exercising its coequal power over the same subject, unless rights had become vested arising under contract which brought into operation some constitutional limitation upon the exercise of such power by a future Legislature. This is a principle well established by all the authorities on the subject. See Cooley's Con. 125–127, note 1, 126.

"In the case of Gonzalez v. Sullivan [16 Fla. 819] this court used this language: 'The court here simply say that the Legislature had the right to designate some objects of improvement to be constructed first, and to postpone others. While this may be true of this Legislature, it is also true of a subsequent Legislature that its powers were not limited by the power of the first, unless the act of the first was of such character as called into operation a constitutional limitation, and something more than a simple antecedent exercise of the powers of the subsequent one. The internal improvement act is not organic law, and the power of one Legislature is no greater than another. Where the power of the subsequent one is limited, it results from the fact that the act of the first is of such character that the organic law renders it inviolable through constitutional limitations covering the subject.' * * *

"So far, then, as these creditors are concerned, their rights are not affected, nor is the obligation of the contract between the state or trustees and them impaired, by the grant in the thirteenth section of the charter of this company; and, this being so, it was competent for the Legislature to make the grant therein without requiring on their part a compliance with the sixth section of the internal improvement act."

It was held by this court, in a cause recently decided (no written opinion filed) involving some of the same questions, that the Legislature of the state of Florida had retained the right to control this fund by subsequent grants in aid of railroads, not only under section 29 of the act creating the fund, but in analogous ways, subject, of course, to any vested rights acquired in the trust fund. This view may be de-

rived in some measure from the above decision of the Supreme Court of Florida and from Rogers Locomotive Works v. Emigrant Co., supra, in which Mr. Justice Harlan in the opinion of the court says (164 U. S. 576, 577, 17 Sup. Ct. 193, 41 L. Ed. 552):

"Are those in this action who claim under the state and under the act of 1850 in any better condition than the state? Can they be heard to question the action of the Land Department in 1858, if the state is estopped from so doing? We have seen that the county of Calhoun made a written agreement in 1861 with the American Emigrant Company relating to swamp and overflowed lands. But, if no such agreement had been made, would the county be heard to say that the Land Department erred, as a matter of fact, when, in 1858, it decided that these lands passed to the state under the railroad act? Would the creature of the state be permitted to say what its creator was estopped from saying? The county of Calhoun is a mere political subdivision of the state, created for the state's convenience, and to aid in carrying out, within a limited territory, the policy of the state. Its local government can have no will contrary to the will of the state, and it is subject to the paramount authority of the state in respect as well of its acts as of its property and revenue held for public purposes. The state made it, and could, in its discretion, unmake it, and administer such property and revenue through other instrumentalities. Jefferson County v. Ford, 4 G. Greene (Iowa) 367, 370; Soper v. Henry County, 26 Iowa, 264, 267; Maryland v. Baltimore & Ohio Railroad, 3 How. 534, 550, 11 L. Ed. 714; United States v. Railroad, 17 Wall. 322, 329, 21 L. Ed. 597; Hamilton County Commissioners v. Mighels, 7 Ohio St. 109, 113; Askew v. Hale County, 54 Ala. 639, 640, 25 Am. Rep. 730; 1 Dillon's Mun. Corp. §§ 22, 23, 54–71, inclusive, and authorities there cited; Angell Ames on Corp. § 31. It would seem to be clear that the relations of the county and the state are such that the action of the latter in accepting the lands in controversy under the railroad act was binding upon the county of Calhoun as one of the governmental agencies of the state; and that the county could not, after such acceptance, claim these lands as swamp and overflowed lands, or by assuming to dispose of them as lands of that character pass to the purchaser the right to raise a question which, in view of its subordination to the state, it was estopped from raising. We are of opinion that the plaintiff could not, by any agreement made with the county in 1861 or afterwards, acquire any greater rights or better position in respect of these lands than the county itself had after the certification of them in 1858 as lands inuring to the state under the railroad act of 1856 (Act May 15, 1856, c. 28, 11 Stat. 9)."

But, irrespective of the right of the Legislature to make subsequent grants, the complainant has set up in the bill the action of the trustees in granting a certificate setting apart and agreeing to deed certain lands, the object of this litigation, to complainant's predecessor in title, when patent thereto had been received from the United States. This agreement was a practical recognition by the trustees of the power of the Legislature over the fund, and an acceptance of this further limitation upon the trust. This recognition was made a matter of record in a suit instituted some years since, as set forth in the bill, in which the predecessor in title of complainant instituted proceedings in this court to get decree of foreclosure on this property on mortgage made by the railroad company to him. The trustees were joined as defendants, and in their answer they say:

"That the lands described in the bill of complaint were selected as swamp and overflowed land under the act of Congress approved September 28, 1850; but these defendants are not personally aware of their real character, such a question being determined by the Secretary of the Interior at Washington,

D. C., in whom is vested by law the authority to decide as to the character of swamp and overflowed lands. * * * The State Engineer having reported favorably upon the construction of ten miles of road by the said Augusta, Tallahassee & Gulf Railroad Company, the trustees aforesaid, on the 16th day of March, A. D. 1889, issued to the said railroad company a certificate numbered 13,909, a copy of which was attached, * * * setting forth that the lands had been earned by the said railroad company, and that conveyance by deed to the said lands would be made to the said company as soon as they were patented to the state of Florida by the United States government; that subsequently to that date, to wit, on the 5th day of July, 1890, and on the 2d day of December, 1890, deeds were made by the said trustees to the said Augusta, Tallahassee & Gulf Railroad Company for a portion of the lands described in said certificate, as shown by the exhibits hereto attached, marked 'B' and 'C,' which exhibits, it is prayed, may be taken as a part hereof, the land so conveyed having been patented to the state of Florida by the United States Government subsequently to the issue of the certificate above referred to."

Said trustees, further answering, said:

"They will convey by deed to the said Augusta, Tallahassee & Gulf Railroad Company the remaining lands embraced in said certificates above mentioned as soon as patents for the same are issued by the United States government to the state of Florida, save and excepting the rights of actual settlers and the rights of Sidney I. Wailes and John A. Henderson for selecting lands and procuring patents for swamp and overflowed lands."

On this answer the cause was set down for hearing without replication, and thereafter the cause was brought on for hearing before the United States Circuit Court on such answer and the testimony of the defendants other than the board of trustees, and a decree was made in favor of complainant, which was in the usual form of a decree as to the other defendants, but provided, among other things, as follows:

"Ordered, adjudged, and decreed that the defendants, and all persons claiming by, through, or under them since the commencement of this suit, be forever barred and foreclosed from all equity of redemption of, in, and to the said mortgaged premises, or any part thereof. 'And it is further ordered, adjudged, and decreed that upon the execution and delivery of the conveyance or conveyances as aforesaid the purchaser or purchasers, his, her or their representatives or assigns, be let into possession of the portion of said mortgaged premises conveyed to him, her, or them, and that any of the parties to this suit who may be in possession of said premises or any portion thereof, and any person or persons who since the commencement of this suit has come into possession under them or any of them, on the production of the special master's deed of conveyance shall surrender possession thereof to such purchaser or purchasers, his, her, or their representatives or assigns, and on refusal so to do will be considered in contempt of this court.' "

The Augusta, Tallahassee & Gulf Railroad Company appealed from this judgment, and the assignment of error that the title to the lands was in the United States was considered by the court. While the Circuit Court of Appeals did not pass directly upon this question, it held that the company had a full equitable title to the lands in controversy, and sufficient to mortgage said lands by virtue of such title; but the point was expressly made on this appeal on behalf of complainant, and clearly acquiesced in by the Circuit Court of Appeals, that by the act of the Legislature of Florida, January 6, 1855, this legal title passed to the board of trustees, defendants, who have not appealed from the decree; and the trustees say in

their answer they will convey to appellant the remainder of the lands as soon as they receive the patent. They could not convey before. The equitable title passed by the grant to every acre of land that is swamp and overflowed land in point of fact. The appellant admits by its mortgage it is all swamp and overflowed land. The trustees admit by their answer and exhibit thereto that it is swamped and overflowed lands, and stopped from and do not seek to controvert it. With the appellant were joined as defendants in the court below the trustees of the internal improvement fund of the state of Florida and William Clark. As these last-named defendants were not substantially affected by the decree of the court below, they did not join in the appeal. The appeal to the Circuit Court of Appeals was not successful, and the decree below was affirmed, and carried out by the sale of the mortgaged premises by the special master appointed for that purpose. On such sale the property was acquired by Joseph J. Kittel, from whom complainant, as above stated, has derived right.

The trustees are a continuing body, although the individual membership is ever fluctuating, and they are as much bound in this action as though the present members had joined in this answer.

These facts, in my opinion, under the authorities establish an estoppel of record as against the trustees, the defendants in this action. The trustees in that suit were under the obligation to bring forward their whole case, and this court will not, except under special circumstances, permit the same parties to open the same subject of litigation in respect of matters which might have been brought forward as a part of the subject in controversy, but which they did not, through inadvertence, negligence, or because the policy of the trustees or of the state as respects the administration of the fund had changed. The trustees in this prior litigation not only had the right to set up any existing defenses that would defeat the foreclosure, but they went further, and by express admissions of record conceded its validity, and saw fit to take no part upon the question directly raised and considered by the court of whether the title in the lands in controversy was in the United States or in the trustees, except to concede it. The questions here raised as to the authority of the State Legislature to deal with the fund, and of the trustees to divert the same, by recognition of this grant, were not presented for determination. The trustees acquiesced in the action of the Legislature, and gave it validity in so far as they could by making a certificate in which they agree to transfer those lands in accordance with the legislative grant, and when a foreclosure of the equities of the railroad company is sought they solemnly make known to the court their intention to conform to the declarations made by them in this certificate, which fulfills every requirement of the law of estoppel of record. Cromwell v. Sac Co., 94 U. S. 351, 24 L. Ed. 195; Outram v. Morewood, 3 East, 346; Mitchell v. First National Bank, 180 U. S. 471, 21 Sup. Ct. 418, 45 L. Ed. 627; Bryan v. Kennett, 113 U. S. 179, 5 Sup. Ct. 407, 28 L. Ed. 908; Stout v. Lye, 103 U. S. 66, 26 L. Ed. 428; Davis v. Brown, 94 U. S. 428, 24 L. Ed.

204; So. Pac. Ry. Co. v. U. S., 168 U. S. 1, 18 Sup. Ct. 18, 42 L. Ed. 355; Hopkins v. Lee, 19 U. S. 109, 5 L. Ed. 218; Smith v. Kernochan, 48 U. S. 198, 12 L. Ed. 666.

It would be a labor of supererogation to cite further authorities upon the question invoked. In Augusta, Tallahassee & Gulf Railroad Company v. Kittel, 52 Fed. 63, 2 C. C. A. 615, it was essential for complainant to show that the mortgagor had a title, legal or equitable, and which could be mortgaged, to support his claim. Whether such interest was based upon the theory of a vested title in præsenti under the act of September 28, 1850, or an equitable interest, is not material now; for it was necessarily decided in the prior action that the interest of the railroad was one capable of being mortgaged, and the court did hold that the certificate was sufficient to convey an interest "mortgable" by the Augusta, Tallahassee & Gulf Railroad Company. Indeed, this question of the title was determined as a matter of law on the demurrers of certain defendants, and was conceded by the answer of the trustees. Suppose, for the sake of argument, that the board of trustees of the internal improvement fund had in such action sought to raise the question of the validity of the title held by itself, and to deny the validity of the certificate, because the title to the lands was still vested in the United States, not in the state of Florida, or in the board of trustees. It would have been perfectly competent for such board to have raised the question as a matter of pleading, and to have had it determined in the prior action. Indeed, petitioner's right in this proceeding, except so far as based on estoppel alone, depends upon the original validity of the title and right to agree to convey the same in the board of trustees at the time of the execution of the certificate, as the validity of the mortgage did in the prior action. Then came the board of trustees, and specifically interrogated whether or not the lands described in the bill in the prior action were swamp and overflowed lands within the sense and meaning of the act of Congress of September 28, 1850, whether it entered into a contract with the Augusta, Tallahassee & Gulf Railroad Company to convey said lands, and whether or not the board of trustees claimed or asserted any interest in the lands adverse to the interest and ownership of said company; and to which said board answered that such lands were selected as swamp and overflowed lands, that the railroad grant had been earned, that the certificate had been executed and delivered, and that the board stood ready and willing to convey by deed the remaining lands embraced in such certificate when patented by the United States government to the state of Florida; and on this pleading and the testimony adduced on behalf of the other defendants a decree was made in favor of the complainant adjudging the foreclosure and the sale of this property, and foreclosing all the defendants, or any person claiming by, through, or under them, forever from all equity of redemption in the mortgaged premises, or any part thereof, and requiring the board of trustees, among others, to surrender possession to the purchaser or purchasers under penalty of contempt of court. It would seem, therefore, that not only was the question of title strictly so

speaking before the court in the prior action, but every essential fact and legal conclusion upon which complainant therein could prevail was thrown open to controversy by the board of trustees, might have been presented, and now stands res judicata as to such board, and would estop it in any proceedings from holding otherwise than as therein determined. If these admissions and acts of the trustees had been clearly without the scope of their trusts, it would follow that they were not binding on its present membership; but as I have concluded that at the time of these transactions the trustees held the equitable title to all the swamp and overflowed land in the state not patented by the United States or otherwise disposed of, and that it was competent for them to recognize the act of the Legislature, whose creature they were, in giving effect to the grant of land to the Thomasville, Tallahassee & Gulf Railroad Company, it follows that the above facts work an estoppel of record.

I have therefore concluded: That the act of Congress of September 28, 1850, is a grant in præsenti of the equitable title to all the swamp and overflowed lands within the boundaries of a state then in existence, and that it was only necessary that the Secretary of the Interior cause a patent to be issued to the state therefor, when the fee simple became vested in the state as of the date of the passage of the act of September 28, 1850. That the state was competent to deal with its inchoate or equitable right to said lands before obtaining patent, and to make grants thereof, subject to the right of the United States in locating and identifying same. That the act of the Legislature of Florida of January 6, 1855, creating the internal improvement fund, does not have a direct tendency to divert the lands from their original purpose, nor has the subsequent railroad land grants, made in accordance with or in analogy to section 29 of said act, such direct tendency. That the trustees of the internal improvement fund, being the creatures of the Legislature of the state of Florida, and having their duties and powers defined by the act of January 6, 1855, which created them, cannot set up the defense that the Legislature had no power to deal with the swamp and overflowed lands because such dealing contravenes the act of Congress. It is not for them to say that the state is violating the obligations imposed upon it by the act of Congress. That is a question between the United States and the state, and not a question between the state and a creature of its Legislature, the trustees of the internal improvement fund. That the issuance of the certificate by the trustees, its mortgage, and the foreclosure proceedings, constitute an estoppel of record as against the present trustees, and that the trustees were competent to undertake and give effect to these acts; and for these reasons the demurrer will be overruled.